## COURT OF APPEALS,

### June 12, 1908.

# THE PEOPLE v. CHARLES H. ROGERS.

(192 N. Y. 331.)

(1.) MURDER—SUFFICIENCY OF EVIDENCE TO WARRANT CONVICTION.

The evidence upon the trial of a defendant indicted for murder examined, and *held*, to present a question for the jury and to be sufficient to warrant a verdict of conviction.

(2.) WHEN ALLEGED WRITTEN CONFESSION CANNOT BE RECEIVED IN EVIDENCE WITHOUT PRELIMINARY EXAMINATION.

Where in a criminal prosecution a paper alleged to be a written confession by the defendant is offered in evidence against him and he objects to its admission and offers to prove at that stage of the trial that the paper was procured from him by such threats or promises or under such other circumstances as, if established, would render it inadmissible, it is the duty of the trial judge to receive the evidence thus offered against the admissibility of the alleged confession before deciding as to the competency of the confession itself ; and it is error to admit the paper without first receiving and considering such evidence.

(3.) SAME—PRELIMINARY EVIDENCE THAT CONFESSION WAS VOLUNTARILY MADE—DEFENDANT'S OMISSION TO SHOW OR TO OFFER TO SHOW THAT CONFESSION WAS IMPROPERLY OBTAINED.

Where, however, there is evidence prior to the reception of the confession tending to show that it had been voluntarily made and there is no offer on behalf of the defendant to prove any circumstance tending to show that it was improperly obtained, or any request made on his part to be allowed to give evidence on the subject, the defendant is deprived of none of his rights by the reception of the alleged confession in evidence, especially where the trial judge takes special care to ascertain by an examination of the officers to whom the confession was made, that it was not induced by any threat or promise of immunity, before he decides to admit the paper.

(4.) WHEN REFUSAL TO CHARGE THAT JURY MUST BE SATISFIED THAT THE ALLEGED CONFESSION "WAS NOT PROCURED BY INQUISITORIAL COMPULSION OR OTHER IMPROPER MEANS," NOT ERRONEOUS.

Where, on the trial of a defendant indicted for murder, the trial judge in his principal charge has not referred to the possibility that a written confession of the defendant, which had been received in evidence, might have been procured by inquisitorial compulsion, his refusal of a request

to charge that the jury must be satisfied that the alleged confession "was not procured by inquisitorial compulsion or other improper means," presents no error, where in view of the uncontroverted evidence in the case relating to the manner in which the confession was obtained, it appears that no inquisitorial, or other compulsion, was exercised over the defendant in order to obtain the confession.

(5.) CONFESSION MADE TO OFFICERS HAVING DEFENDANT IN CUSTODY PROPERLY RECEIVED IN EVIDENCE UNDER SECTION 395 OF CODE OF CRIMINAL PROCEDURE.

A contention that, as the alleged confession was made neither in the course of judicial proceedings nor to a private person, but was made to public officers having the defendant in custody under a warrant of arrest, there was no authority in law for the admission of the confession in evidence, inasmuch as the provisions of section 395 of the Code of Criminal Procedure are to be deemed exclusive and to prohibit the reception of any alleged confession in a criminal prosecution except such as are made either in a judicial proceeding or to a private person, cannot be sustained, since the private person referred to in the statute obviously means any person not engaged in the conduct of a judicial proceeding.

(6.) WHEN EVIDENCE TENDING TO PROVE DEFENDANT GUILTY OF A CRIME, OTHER THAN THAT FOR WHICH HE IS ON TRIAL, ADMISSIBLE.

A contention that the admission of evidence of other murders and of an assault alleged to have been committed by the defendant at the same time as his alleged commission of the murder for which he was on trial, constituted error, inasmuch as the defendant was on trial for but one murder and the evidence thus received tended to establish the commission of other and different crimes, cannot be sustained, since upon the trial of a criminal case, evidence which is relevant to the issue raised by the plea to the indictment is not made inadmissible by reason of the fact that it tends to prove the defendant guilty of another crime than that charged in the indictment. Such evidence is received not because it is proof of the other crime, but because of its relevancy to the charge upon trial.

(7.) EVIDENCE CORROBORATIVE OF A CONFESSION ADMISSIBLE, NOT ONLY AS TO COMMISSION OF CRIME FOR WHICH DEFENDANT IS BEING TRIED, BUT AS TO OTHER CRIMES MENTIONED THEREIN.

A contention that proof offered by the prosecution in corroboration of the confession should have been strictly confined to corroborating that part thereof relating to the murder for which the defendant was on trial, cannot be sustained, since where several crimes are referred to in the same confession the whole thereof is admissible, and under the rule which requires corroboration of a confession by other proof of the commission of the offense charged, corroborative evidence is receivable, not only as to the commission of the crime for which the defendant is being tried, but

also as to the commission of the other crimes mentioned in the confession and presumably committed by the same individual at or about the same time.

APPEAL from a judgment of the Supreme Court, rendered October 31, 1907, at a Trial Term for the county of Orange, upon a verdict convicting the defendant of the crime of murder in first degree.

The facts, so far as material, are stated in the opinion.

*Herbert R. Royce* for appellant. The confession was inadmissible under section 395 of the Code of Criminal Procedure. (*People* v. *Fox,* 121 N. Y. 449; *People* v. *White,* 176 N. Y. 331; *People* v. *Kennedy,* 159 N. Y. 346; Code Crim. Pro. § 542.) The verdict was against the weight of evidence and solely the result of prejudice, and justice requires a new trial. (*People* v. *Nino,* 149 N. Y. 317; *People* v. *Spencer,* 179 N. Y. 408; *People* v. *Corey,* 157 N. Y. 332; *People* v. *Hoch,* 150 N. Y. 291; Code Crim. Pro. § 528.) The court erred in its conduct of the trial, its rulings on questions of law and the admission of testimony. (*Bolte* v. *T. A. R. R. Co.,* 38 App. Div. 234; *People* v. *Hackett,* 82 App. Div. 86; 175 N. Y. 503; *People* v. *Root,* 94 App. Div. 84; *Brooks* v. *R. Ry. Co.,* 156 N. Y. 244; *People* v. *Corey,* 157 N. Y. 332.)

*Thomas C. Rogers* for respondent. The confession of the defendant was properly admitted. (*People* v. *Rogers,* 18 N. Y. 9; *People* v. *McAllister,* 1 Whart. Cr. Cas. 302; *Hartung* v. *People,* 4 Park. Cr. Rep. 319; *O'Brien* v. *People,* 48 Barb. 274; *People* v. *Wentz,* 37 N. Y. 303; *Murphy* v. *People,* 63 N. Y. 590; *Cox* v. *People,* 80 N. Y. 500; *People* v. *Cassidy,* 133 N. Y. 612; *People* v. *Bishop,* 69 Hun, 105; *People* v. *Kennedy,* 159 N. Y. 346.) The charge of murder in the first degree was fully proved. (*People* v. *Deacons,* 109 N. Y. 374.) The fact that the confession was made to an officer does not affect its admissibility. (*People* v. *Rogers,* 18 N. Y. 9; *People* v. *Wentz,*

37 N. Y. 303; *Murphy* v. *People,* 63 N. Y. 590; *Cox* v. *People,* 80 N. Y. 500; *People* v. *Cassidy,* 133 N. Y. 612; *People* v. *McGloin,* 91 N. Y. 241.) The evidence tending to show the commission by the defendant of other crimes was admissible because the facts were so interwoven with his confession of the crime charged that it was impossible to separate them. (*People* v. *Zucker,* 20 App. Div. 363; *People* v. *Loomis,* 178 N. Y. 400; *People* v. *Shea,* 147 N. Y. 78; *People* v. *Sharp,* 107 N. Y. 467; *Pierson* v. *People,* 79 N. Y. 424; *People* v. *Murphy,* 135 N. Y. 451; *Weed* v. *People,* 56 N. Y. 628; *People* v. *Van Tassell,* 156 N. Y. 561; *People* v. *Place,* 157 N. Y. 585; *People* v. *McLaughlin,* 150 N. Y. 365.) The question as to the sanity of the defendant was for the consideration of the jury and they arrived at a proper conclusion in finding him sane. (*Cole* v. *F. B. C. Co.,* 159 N. Y. 59; *Finn* v. *Cassidy,* 165 N. Y. 584; *Gray* v. *B. H. R. R. Co.,* 72 App. Div. 424; *Cowley* v. *People,* 83 N. Y. 464.)

WILLARD BARTLETT, J. The defendant was indicted on the 16th day of January, 1906, for the crime of murder in the first degree, committed by shooting Fred R. Onley with a revolver, in the town of Wallkill, Orange county, on the 6th day of October, 1905. He was arraigned on May 11, 1907, when he pleaded not guilty. Subsequently he added to this plea a specification that at the time of the commission of the crime in question he did not have sufficient intelligence and self-control to understand the nature and quality of the acts committed by him and to refrain from the commission of said acts and that at said time he was mentally incapable and in a state of insanity. The trial began on the 21st day of October, 1907, at a Trial Term of the Supreme Court in Orange county, and ended on the 28th with a verdict of guilty of murder in the first degree. From the judgment rendered upon this verdict the defendant has appealed to this court.

The scene of the homicide of which the defendant was ac-
cused was the Onley farm, which is situated on a highway in
the town of Wallkill, about three miles north of the city of
Middletown.    There were living at this farm, just previous to
the homicide, five persons: Fred R. Onley, a bachelor, aged
about 60 years; Willis Onley, his brother, a widower, who was
some years younger; Mrs. Georgia Ingerick, who had recently
entered upon the duties of a housekeeper for the two brothers,
in consequence of the decease of Willis Onley's wife; Lulu
Ingerick, a girl about 15 years old at the time of the trial, a
daughter of Mrs. Ingerick; and Alice Ingerick, another daugh-
ter, nine years of age.

At eight o'clock on the morning of October 6th, 1905, Lulu
Ingerick left the Onley farm to spend the day in Middletown.
At that time all the members of the household were alive and
well.    When she returned at about half-past five o'clock on the
afternoon of the same day her little sister lay dead in the cellar
of the farm house with her head crushed by some blunt instru-
ment; her mother lay insensible in the horse barn back of the
house, her face bruised and bloody and her body partly covered
with straw or hay; and the two Onley brothers (as was subse-
quently ascertained) lay dead in a piece of woods to the north
of the house, both manifestly having been shot to death by
means of a revolver.    The condition of things at the house and
also the condition of the clothing of the Onley brothers indicated
that the perpetrator of the crime was actuated by purposes of
plunder.    The bedding on the beds had been torn out of place; a
drawer had been pulled out of a bureau and thrown down on the
floor; in the attic was a valise which had been cut open, and there
were other signs of disorder.    The pockets of the Onleys were
found turned inside out and emptied of their contents, and the
watches which they were known to have carried were missing.
Mrs. Ingerick was in such a physical condition as to be unable
to give any explanation as to how she came to be where she was

found; she remembered only that at about noon a stranger had come to the farm saying that some one was hurt up in the fields, and had asked her for a basin of water and a cloth. She got a cloth in accordance with his request, and went to the well near the wagon house for a pail of water, but at that point her recollection ceased. She could remember nothing that had happened afterward on that day.

The defendant lived with his wife and children in the city of Middletown. He left home at seven o'clock on the morning of October 6th, 1905, and never returned. He was arrested in Los Angeles, California, in April, 1907; and was brought to New York by the sheriff of Orange county, a deputy sheriff, and the chief of police of the city of Middletown. In the course of the railway journey he made a series of oral statements to these officers in relation to the homicides at the Onley farm, and, finally, at their instance, signed the following confession, which substantially embodied what he had previously stated by word of mouth:

" ON ERIE TRAIN NEAR COREY, PA., EN ROUTE FROM LOS ANGELES, CAL., TO ORANGE CO., N. Y.

" *To whom it may concern.*

" I, Charles H. Rogers, do hereby make the following statement relative to the circumstances in connection with the deaths of Willis and Fred Onley and Alice Ingerick, which occurred on October 6, 1905.

" On the morning of Oct. 6, 1905, I left my home at 5 Oak Street, Middletown, N. Y., at some time between seven and eight o'clock A. M., going up Washington Street to South and then out West Main to Hanford Street; on reaching the corner of Hanford Street and West Main Street I boarded a trolley car bound for the State Hospital. Then I alighted at the corner of Lake Avenue and Olive Street and took to the Erie tracks and walked westward until I arrived at a point on the said Erie Road known as ' Hogback.' I left said track at a point just east

of the overhead bridge leading to the Fish Farm, passing through a piece of woods owned by one Nora Corwin. I walked through said woods and crossed the highway leading to the Fish and Onley farms at a point near the top of the hill and between said bridge and where my parents, Mr. and Mrs. Henry Rogers, reside. After doing so I passed on to a piece of woods owned by said Nora Corwin west of said highway. I continued on through Frank Fish's woods, also through another piece of woods owned by Mr. Horace Beaks. Then I crossed over the hill to the Onley farm. This was about 9 o'clock A. M. I saw Willis Onley in the barn yard. I asked him when Fred would get back from taking the milk. He said, ' I don't know, but he ought to be back pretty soon.' I remained there in the barnyard and talked with Willis until Fred returned about fifteen or twenty minutes later. I asked them to go to the woods with me to help get a man. I passed myself off as a detective. The three of us got in the milk wagon that Fred had just drove in with and went up to the woods driving to the corner of the field by the woods. While Willis held the team Fred went down into the woods with me. I shot Fred, but I don't remember how many times. Willis came down on hearing the shots and passed about one hundred and fifty feet by me when I shot Willis once. Then I went through the pockets of the men and secured two watches and sixteen dollars in cash. A pocketbook which I took from Fred's body after taking out the contents, I hid the pocketbook in the stone wall where Willis stopped with the team in the corner of the open lot. Then I drove the team back down to the house, where I unhitched the horses and put them in the barn. After doing so I went in and told Mrs. Ingerick that Fred had been kicked by a horse. Mrs. Ingerick returned to the barn with me and went in the horse stables. I followed her into the far end of the said stables and when her back was turned I struck her over the head with the iron gas pipe which I had previously hidden in the weeds. After I struck her I covered her up in the

horse stall with hay. I then went to the house, and as I entered saw Alice Ingerick in the kitchen and I sent her down cellar to close the outside cellar door. I followed her down cellar, and when she arrived about half way across the cellar I struck her over the head with the same pipe I had struck Mrs. Ingerick with, and which I had carried from the barn to the house. I ransacked the house, but found no money. I took nothing from the house. I heard some one drive up to the house while I was upstairs. I saw two men from the attic window in front of the wagon house. They had a wagon something like a buckboard. When I saw the men outside through the window I left the house by the kitchen door and went out the back way, and went over the hill toward the woods through the orchard. I did not know the girl was in the house when I went in after striking Mrs. Ingerick. I went through the woods to the Erie R. R. and jumped a freight train and rode to Otisville. I remained there until night and took the Orange County Express to Port Jervis. I remained at the Delaware House that same night, registering at the Delaware House under the name of Smith. The next night, Saturday, I remained at a hotel on the street facing the railroad. The morning following my arrival at Port Jervis I sold one of the watches at a hotel situate on the street where the railroad crossing is located. Received four dollars for it. The other watch was stolen from me in a Port Jervis saloon not far from where I sold the other watch. The revolver I threw away up along the street by the railroad track. I also threw away what cartridges I had left. I threw the revolver and cartridges away because I heard some one say the authorities were looking for some one, and I did so through fear, if found on me I would be suspected and arrested.

" I left Port Jervis Sunday night, October 8th, 1905, after buying a ticket to Huntington, Indiana. My idea was to go to Chicago, but did not go through because I did not have money enough for a ticket all the way. I stayed in Huntington a week

or a little over, and then went on to Chicago ' blind baggage ' or
beating my way.   Here I worked for ten months for a man by
the name of Pulsifer at Glenwood, twenty-three miles from
Chicago.   I left Chicago, September 22, 1906, for California,
going first to San Francisco, where I remained one day.   Then
went thirty miles from Maderia to work on the Maderia Sugar
Pine Farm, working there one month.   I then entered the em-
ploy of Mace Bros., proprietors of the Yosemite Hotel at Ma-
deria.   I was there two months.   Then went on south to Fresno,
staying one night and next day went to Bakerfield, staying there
one night also.   The day following I went to Los Angeles and
was there one week.   There I received some mail that had been
forwarded me from Maderia.   I worked eighteen days on the
Tonopaugh Tide Water Railroad, two and a half miles from
Los Angeles.   I then returned to Los Angeles and secured em-
ployment at Burbank with a Mrs. Stough, was there five days,
when I returned to Los Angeles.   On April 8th, 1907, while
endeavoring to procure mail from the Los Angeles post office I
was arrested and locked up in the city jail.

" CHARLES H. ROGERS.

" Signed in presence of
        " John D. McCoach,
        " F. C. Hoch."

Assuming that this written confession and the more frag-
mentary oral confessions which had preceded it to have been
properly admitted in evidence, the prosecution, as required by
section 395 of the Code of Criminal Procedure, furnished· addi-
tional proof that the crime charged had been committed.   The
confession was abundantly corroborated not only in this respect
but in many particulars of less importance which strongly tend,
however, to impress the mind with a conviction of its substan-
tial truth.   As has already been stated the defendant left his
home at about 7 A. M. on the day of the crime.   He was not subse-

quently seen by his wife until after he had been brought from Los Angeles in April, 1907. Shortly after seven o'clock on that morning he was encountered and spoken to by a witness, who testified on the trial, upon the road between his house and the Onley farm. At about noon a witness, who was picking apples in an orchard beyond and to the north of the Onley woods, heard five or six pistol shots in the direction of the woods, followed by the noise of voices which sounded to him like the shouts of persons excited by participation in a shooting match. He concluded that this was the origin of the shouts and, therefore, he refrained from going into the woods to ascertain what was the matter. The defendant was seen again on the afternoon of the same day by a track foreman on the Erie railroad, who observed him going up in a westward direction towards Otisville at about 2 P. M. When the defendant saw the witness he crossed the track and went into the woods on the other side. About half an hour later he came down onto the track again and again proceeded westward. On the register of the Erie Hotel at Port Jervis appeared the name of George Smith under date of October 6, 1905. The defendant had stated in his confession that he registered at Port Jervis under the name of Smith on the evening of that day, but he designated the hotel as the Delaware instead of the Erie House. There was proof of the sale of a watch for four dollars by an unidentified man to a person at Port Jervis about the time of the Onley murders. This watch was shown to have belonged to Willis Onley. On October 8, 1905, a 32-calibre revolver was found at or about the place where the defendant according to his confession had thrown away a revolver of that description. The pocketbook of Fred R. Onley was discovered near the spot where, according to the confession, the defendant had placed it. Not far off was a check which had been given to Fred R. Onley shortly before his death and which had never been presented for payment. A gas pipe wrapped in a newspaper was in the defendant's possession the day before the

homicide.   A gas pipe wrapped in a bloody newspaper was found
in a closet back of the stove in the Onley house and was ap-
parently the instrument with which Alice Ingerick was killed
and with which the wounds were inflicted in the murderous
assault upon her mother.   It is proper to say, however, in refer-
ence to this element of the corroborative proof that the defend-
ant's wife did not identify the gas pipe found in the Onley house
with that which she had seen in her husband's possession on the
day before he left home.   Finally the confession was corroborated
in a very important respect by the testimony of Mrs. Ingerick
to the effect that a strange man came to the Onley farm on the
day when she was assaulted and requested her to furnish aid to a
person who had been hurt up in the field.   As has already·been
explained, she was so badly injured that she remembered little
or nothing which followed.

The evidence offered in behalf of the defendant was almost
wholly in support of the insanity specification contained in his
plea of not guilty.   His mother testified that when he was be-
tween seven and eight years of age he met with an accident by
falling out of a window to the ground, about fifteen feet below,
and suffered a blow upon the head which rendered him uncon-
scious for a time.   In 1898, when he must have been nearly
thirty years old (he was thirty-eight at the time of the trial) he
was struck by a railroad train while attempting to drive across
the Erie railroad in a vehicle and sustained a fracture of the
thigh and injuries to his head and spine.   After the latter acci-
dent he expressed the fear that he would go crazy and exhibited
a disinclination to associate with others.   He manifested de-
spondency, and in the summer and autumn of 1905 frequently
complained of pains in his head and back, and declared that he
wished he had shot himself and did not care to live.   The mother
characterized·various acts of the defendant to which she testified
as being irrational.   The locomotive engineer of the train by
which he was struck in 1898 testified to the fact of the accident

and the physician who treated him at the time described the injuries which resulted therefrom, expressed the opinion that the defendant had less control over his temper after the accident than he had before and furthermore declared that the condition of the spine which he discovered as an effect of the accident was adequate to produce mental trouble, insanity and an inability to distinguish between right and wrong. The wife of the defendant also gave testimony tending to show that he had frequently manifested an abnormal state of mind. She said that about every week he had a " spell ", and wanted to die. He frequently complained of pains in his head and back. During the year preceding the homicides his disposition was " cranky " and at times he was sullen. " I don't know that man any more to-day," she said, " than the day I married him, because he was always the same as you see him now. I mean he was quiet and if you would say anything to him he would give you a cranky answer." He had a revolver loaded with cartridges which he was in the habit of handling constantly. Nevertheless his wife testified that she was not very much afraid of him and was never very much afraid that he would commit suicide from what he said, although he talked about taking his own life. " In regard to whether he ever talked about taking any one else's life," she said, " I could only give you the answer he gave me when he went out of the house with the pipe that night. I told him not to kill anyone, and he said, ' So help me Christ I will.' That was the night before the murder, the time that he took the pipe out of the house." This referred to the piece of gas pipe which has already been mentioned. A Middletown physician and surgeon who had known the defendant between ten and fifteen years and had frequently treated him and the members of his family, testified that on the evening of the 5th of October, 1905, the day before the homicides were committed, the defendant applied to him for a loan of ten dollars, being indebted to him at the time in the sum of thirty dollars. The witness loaned

the defendant ten dollars but testified that he was unable to make him comprehend that his indebtedness was thereby increased to the sum of forty dollars. On receiving the ten dollars the defendant gave him a check for thirty dollars which, however, was dishonored upon presentation at the bank. In answer to a hypothetical question this witness expressed the opinion that the defendant was insane on the 6th day of October, 1905, and was unable to understand the nature and quality of a crime.

The People called in rebuttal two witnesses. One of them was a clerk for a clothier at Middletown, who sold a suit of clothes, a shirt and a hat to the defendant on the afternoon of October 5th, 1905, and whose narrative of the circumstances attending the purchase and sale tended to show that the defendant was entirely rational at that time. The second witness was Dr. Maurice C. Ashley, superintendent of the Middletown State Hospital. He testified to having made four examinations of the defendant with a view of determining his mental condition. He narrated the particulars of these examinations, and as a result expressed the opinion that the defendant was sane. Dr. Charles W. Pilgrim, superintendent of the Poughkeepsie State Hospital and some time president of the state commission in lunacy; Dr. Charles G. Wagner, superintendent of the Binghamton State Hospital, and Dr. Robert B. Lamb, superintendent of the Hospital for the Criminal Insane at Matteawan, participated with the witness in making one of the examinations. Upon cross-examination it was brought out that the witness, together with these three physicians, had signed the following statement in reference to the defendant's condition:

"GOSHEN, N. Y., *October 8th,* 1907.

" We, the undersigned, having examined Charles H. Rogers, now under indictment for murder, respectfully report as follows: We do not find that the said Rogers is insane, but we do find that he is of such a low order of mental and moral development that he belongs to the defective class, and while not presuming

to suggest to the Court, we believe that the ends of justice would be served if he was confined to prison for life.

" MAURICE C. ASHLEY.
" CHARLES W. PILGRIM.
" CHARLES G. WAGNER.
" ROBERT B. LAMB."

Of course this paper was relevant only as tending to qualify the opinion expressed by the witness on his direct examination to the effect that the defendant was sane; and it was evidently introduced with the idea that such qualification was to be found in the statement that the defendant was of such a low order of mental and moral development that he belonged to the defective class. Nevertheless it contained a clear declaration that the experts who signed it did not find the defendant to be insane, and this must have meant that in their judgment insanity did not exist even in the medical sense, which is much broader than that degree of insanity which must exist in order to free a person from responsibility for the commission of a crime. There was nothing in the execution of this paper by Dr. Ashley to prevent the jury from accepting as correct the opinion which he expressed upon the witness stand as to the insanity of the defendant.

From the summary which has been given of the evidence upon the trial it is quite manifest that the issue of the defendant's guilt or innocence arising upon the indictment and the plea was clearly a question for the jury and that their finding should not be interfered with by this court unless some error was committed in the rulings of the trial judge upon evidence or is to be found in his instructions to the jury or his refusals to charge the jury as requested by counsel for the defendant. I will proceed, therefore, to discuss the alleged errors which have been called to our attention on the oral argument and in the brief for the appellant.

When the written confession was offered, counsel for the defendant objected to it as irrelevant, incompetent and immaterial;

that there was no foundation laid sufficient to justify the offering of the statement in evidence; and that it appeared that the statement was made by the defendant, if at all, while he was under arrest and in the custody of the sheriff and deputy sheriff and chief of police of the city of Middletown.

At the time that the confession was thus offered Abraham L. Decker, sheriff of Orange county, one of the persons who procured the confession, was on the witness stand. The court, before ruling, asked the witness whether any promise was made to the defendant before he made this statement, or while making it—any promise of immunity; and the witness answered: "None whatever." The court then asked: "Was any threat made by you or either of the other officers either before the statement was made or while it was being made?" The witness again answered: "None whatever." The court then received the paper in evidence.

Where in a criminal prosecution a paper alleged to be a written confession by the defendant is offered in evidence against him and he objects to its admission, and offers to prove at that stage of the trial that the paper was procured from him by such threats or promises or under such other circumstances, as, if established, would render it inadmissible, it is the duty of the trial judge to receive the evidence thus offered against the admissibility of the alleged confession before deciding as to the competency of the confession itself; and it is error to admit the paper without first receiving and considering such evidence. This has been held to be the law in New York and Massachusetts. (*People* v. *Fox,* 121 N. Y. 449; *Commonwealth* v. *Culver,* 126 Mass. 464.) In the case last cited it is said that the prisoner has always the right to require of the judge a decision as to the competency of evidence which is offered against him and even after the judge has decided the evidence to be competent the prisoner has the right to ask the jury to disregard it and give no weight to it because of the circumstances under which the confessions were

obtained. When a written confession is offered in evidence against a defendant and objection is made to its admissibility on account of the circumstances under which it was obtained it becomes the duty of the trial judge to pass upon its competency.

In some jurisdictions it has been expressly held that in the absence of any evidence on the subject the presumption is that the confession is voluntary. Thus, it has been said by the Supreme Judicial Court of Massachusetts: "*Prima facie,* all confessions are voluntary, and it is for the party objecting to their admission as evidence to show that they were uttered under such pressure of hope or fear as to raise a doubt of their accuracy." (*Commonwealth* v. *Sego,* 125 Mass. 210.) In the case of *Rufer* v. *State,* (25 Ohio St. 464), it is said that there is no presumption of law that confessions are induced by improper representations made to the prisoner, but "on the contrary, like every other act of the human hand or head, they are presumed to be voluntary until the contrary is shown." The Supreme Judicial Court of Maine has also expressly declared that in the absence of evidence all confessions are presumed to be voluntary. (*State* v. *Grover,* 96 Me. 363.) Such is also the rule in Indiana. (*Hauk* v. *State,* 148 Ind. 238.) As Mr. Wigmore has well said: "This is the practical and natural rule; for if there is any reason to object to the confession, no one can know it better than the defendant." (1 Wigmore on Evidence, § 860.) In the case at bar, however, it is to be observed that there was evidence tending to show that the confession was voluntary before it was received and we are now only concerned with the question whether the defendant was deprived of his right at the time when it was offered, to tender proof in his own behalf bearing upon its admissibility inasmuch as the proper time for the defendant to offer such testimony and for the court to receive it is before the objection to the admissibility of the confession is passed upon. The record contains no suggestion of any offer in behalf of the defendant to prove any circumstances tending to show that the con-

fession was improperly obtained or any request on his part to be allowed to give evidence on the subject. In other words, he did not invoke the rule laid down in the cases cited. On the other hand, it is apparent that the trial judge took special care to ascertain that the confession was not induced by any threat or promise of immunity before he decided to admit the paper.

In *People* v. *White* (176 N. Y. 331, 349, 17 N. Y. Crim. 538) it was said by VANN, J.: "The competency of a confession is to be determined by the trial court upon the facts in evidence at the time it is offered. It is proper, and such was the course pursued in this case, to allow a preliminary examination by the defendant's counsel to test its competency before it is received." The same course would have been proper in the case at bar, and, indeed, it would have been an error to have refused to allow it if the defendant's counsel had asked that it be pursued, but that as has already been pointed out he did not do.

The test of the admissibility of the statements of a party accused of the commission of a crime whether made in the course of judicial proceedings or not is whether they were voluntary. (*People* v. *Chapleau*, 121 N. Y. 266, 274.).

The decisions in this state as to the admissibility of confessions are fully reviewed and considered by MARTIN, J., in *People* v. *Kennedy* (159 N. Y. 346, 14 N. Y. Crim. 114).

The learned trial judge in his principal charge instructed the jury in reference to the alleged confession as follows:

"Before you can regard this alleged confession as evidence against the defendant you must be satisfied that the statements were made by him substantially as given by the witnesses and contained in the paper prepared by the sheriff and signed by the defendant; that such confession and all the statements contained therein were freely and voluntarily made by the defendant. * * * So that this confession is not evidence to be considered by you unless you find that there was no fear pro-

duced by threats and no promise made by the district attorney, or on behalf of the district attorney, not to prosecute him on this charge.   *   *   *   If there was no threat and no promise that he should not be prosecuted, and if the statements were made voluntarily, as they are contained in the written paper, and were testified to by these three witnesses, then you may consider such statement as some evidence in support of the charge here made against him.   The confession is not sufficient to warrant the conviction of the defendant—that is, it alone is not sufficient; there must be additional proof that the crime charged against the defendant has been committed."

Notwithstanding this language it is contended that the trial court erred in the manner in which it dealt with the tenth numbered request of the defendant, which was to charge the jury as follows:  "That in order for the jury to consider the alleged confession as against the accused, they must be satisfied that such alleged confession was fairly obtained, and was not procured by inquisitorial compulsion or other improper means."

To this request the court responded as follows:  "I refuse to charge in that form.  I will charge you, gentlemen, that if the confession was made freely, and voluntarily, and without fear produced by threats, and without any promise on the part of the district attorney not to prosecute him for the alleged act, then it may be considered as evidence."

Counsel for the defendant excepted to the refusal to charge as requested and also to the modification.

So far as this request was concerned the only possible ground of complaint on the part of the defendant is that the court refused to charge that the jury must be satisfied that the alleged confession "was not procured by inquisitorial compulsion or other improper means."  In *People* v. *White* (176 N. Y. 331, 350, 17 N. Y. Crim. 538) the jury were instructed to disregard the confessions, "unless they were voluntary, fairly obtained and

not procured by inquisitorial compulsion or other improper methods." The court did not hold that the trial judge was bound to give the jury this instruction, but held only that the defendant could not justly complain of his course in thus submitting to the jury the question of fact whether the confessions there under consideration fell within the prohibition of the statute or of the rules of evidence. In the present case the trial judge in his principal charge had not referred to the possibility that the confession of the defendant might have been procured by inquisitorial compulsion, and it is said that his refusal to charge this tenth request excluded that element from the consideration of the jury. Was this error? I think not, in view of all the evidence in the case in regard to the manner in which the confession was obtained. That evidence was furnished by the testimony of the three officers who procured it. Their testimony was uncontroverted, as the defendant himself did not take the stand. A careful examination of their narrative of all the occurrences which took place upon the train in reference to the confession satisfies me that no inquisitorial or other compulsion was exercised over the defendant in order to obtain the statement which he first made orally and which was afterward reduced to writing and signed by him. The officers undoubtedly questioned the defendant persistently in regard to his connection with the crime. They told him that it would be best for him to make a clean breast of it, to make a confession. "He was somewhat reluctant about telling us these things and it took a great deal of persistent effort on our part to drag these things out of him. * * * We told him that we thought he had committed the crime." One of the officers told him he knew he did it. Some love letters had been found by the officers in his valise or dress suit case when he was arrested, and the defendant said that he would tell how he committed the crime if the officers would give him these love letters. Some of these love letters were obtained from the sheriff and given to the defendant, after which he

continued to tell more about his connection with the murders. All of the officers, however, positively and explicitly denied having offered the defendant any inducement to confess or having threatened him in any way. When asked what was the inducement to the confession, Sheriff Decker answered: " It was the persistency with which we kept at him." He added: " I held out no inducement to·this man; I told him nothing to induce him to tell this story. The other persons who were with me did not make any statement, inducement or promise to extract this story from him, or to induce him to tell the story whether it was true or not in my presence. * * * It was drawn out of him gradually." It appears that he was kindly treated on the journey; was not ill, although his physical condition is described as not being very good; but he sat up every day and smoked; and, although he was handcuffed part of the time, there were no handcuffs on him when a portion at least of the confession was made. The defendant had at first asserted that the murders were planned jointly by him and one Dan Davis, but that Davis did the shooting of the Onley brothers by a 32-calibre revolver given to him by Mrs. Rogers. At this time the defendant denied that he committed the crime himself. Deputy Sheriff Hock, who was one of the officers, told the defendant that he lied about Dan Davis; that Dan Davis was not at the place or near it at the time when the crime was committed; and according to the defendant's final statement Dan Davis had nothing to do with the commission of the murder.

No deception was used in order to induce the defendant to tell the truth, unless it is to be found in their assertion that the officers knew he was guilty. In view of the fact that the defendant was under indictment for the murder, they cannot be held to have been wholly unjustified in telling the defendant that they knew all about it, and knew that he was guilty of the crime.

The Code of Criminal Procedure provides as follows:

" A confession of a defendant, whether in the course of

judicial proceedings or to a private person, can be given in evidence against him, unless made under the influence of fear produced by threats, or unless made upon a stipulation of the district attorney, that he shall not be prosecuted therefor; but is not sufficient to warrant his conviction, without additional proof that the crime charged has been committed." (Code of Criminal Procedure, § 395.)

It is contended in behalf of the appellant that as the alleged confession was not made either in the course of judicial proceedings or to a private person, but was made to public officers having the defendant in custody under a warrant of arrest, there was no authority in law for the admission of the confession in evidence; inasmuch as the provisions of section 395 of the Code are to be deemed exclusive and to prohibit the reception of any alleged confession in a criminal prosecution except such as are made either in a judicial proceeding or to a private person.

This limitation is not permissible. The private person referred to in section 395 obviously means any person not engaged in the conduct of a judicial proceeding. That this has been the construction of that section is apparent from numerous decisions of this court rendered since its enactment. Thus, in *People* v. *White* (176 N. Y. 331, 17 N. Y. Crim. 538) the confessions of the defendant were made out of court to a sheriff and deputy sheriff. In *People* v. *Kennedy* (159 N. Y. 346, 14 N. Y. Crim. 114) the confessions were made at a police station to a sergeant of police. In *People* v. *Cassidy* (133 N. Y. 612) the confessions were made to Inspector Byrnes of the New York police force. Many other cases might be cited to the same effect, which have been decided since the adoption of the Code of Criminal Procedure, in all of which the confessions were held to have been properly admitted.

It is contended in behalf of the defendant that the trial court erred in admitting any evidence as to the murder of Willis

Onley and Alice Ingerick, or as to the assault upon Alice's mother, Mrs. Ingerick, inasmuch as the defendant under this indictment was put upon trial for the murder of Fred R. Onley alone, and the evidence thus received tended to establish the commission of other and different crimes. The same proposition is urged in reference to the corroborative proof offered by the prosecution, which it is contended should have been strictly confined to corroboration of the confession only so far as it related to the killing of Fred R. Onley.

The answer to the first point is plain. Upon the trial of a criminal case evidence which is relevant to the issue raised by the plea to the indictment is not made inadmissible by reason of the fact that it tends to prove the defendant guilty of another crime than that charged in the indictment. Such evidence is received, not because it is proof of the other crime, but because of its relevancy to the charge upon trial. (See *People* v. *Shea,* 147 N. Y. 78, 10 N. Y. Crim. 1.) Thus, it has been held that where the evidence indicates the commission of two crimes, and that the person who committed the other crime also committed that for which the defendant is on trial, it is permissible to show that the defendant was the person who committed the other crime, because " the evidence of his guilt of such other crime is direct evidence of his guilt of the crime for which he is on trial." (*People* v. *Sharp,* 107 N. Y. 427, 468.)

As to the second point, the case of *People* v. *Loomis* (178 N. Y. 400, 406, 18 N. Y. Crim. 323) recognizes and asserts the existence of " cases in which each part of a conversation is so essentially interwoven with every other part that a confession of the crime charged cannot be proven without admitting evidence of the whole transaction;" but Judge WERNER goes on to say that in such a case " the extraneous matter, if it tends to incriminate the defendant, should not be taken as a substantive fact, and should only go to the jury under cautionary instructions from the court."

It follows that where both crimes are referred to in the same confession the whole confession is admissible; and that, under the rule which requires corroboration of a confession by other proof of the commission of the offense charged, corroborative evidence is receivable not only as to the commission of the crime for which the defendant is being tried, but also as to the commission of the other crimes mentioned in the confession and presumably committed by the same individual at or about the same time.

It is true that the defendant was on trial only for the murder of Fred R. Onley. Inasmuch, however, as his confession indicated that the killing of Fred R. Onley was connected with and part of a scheme of crime which included the killing of Willis Onley and Alice Ingerick and the murderous assault on Mrs. Ingerick, it was proper for the trial court to receive corroborative evidence tending to establish the defendant's guilt of these other crimes as well as corroborative evidence indicating that he had murdered Fred R. Onley. The acts constituting the several offenses were indissolubly associated in his confession and the corroborative evidence tending to show his commission of any one of the crimes, therefore, tended, in some degree at least, to show that he committed the others. The learned trial judge was very careful for the most part to exclude all evidence which did not by reason of such association have an obvious relation to the crime charged in the indictment. Perhaps the only respect in which he erred was in admitting the apron and the head dress worn by Mrs. Ingerick at the time when she was assaulted; but if this was an error it was wholly immaterial and cannot possibly have affected the result.

I have discussed only the main points presented in the brief and oral argument in behalf of the appellant. Every other point, however, to which our attention has been called has been carefully considered, and it appears that the objections are either not sustained by the record or not well taken. My conclusion is

that the defendant has had a fair trial and has been found guilty upon legal evidence which amply warranted his conviction; and, therefore, that the judgment should be affirmed.

CULLEN, Ch. J., GRAY, VANN, WERNER, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.