Argued November 14, 1918, reversed and remanded January 28, 1919.

# STATE v. BAILEY.

(178 Pac. 201.)

### Robbery—Identity of Property—Sufficiency of Evidence.

1. In a prosecution for robbery, evidence *held* sufficient to prove existence and identity of note described in indictment as taken from prosecuting witness.

### Criminal Law—Directing Verdict.

2. Discrepancies between witnesses called by state do not of themselves entitle a defendant to a directed verdict.

### Robbery—Sufficiency of Evidence.

3. In a prosecution for robbery, evidence *held* sufficient to show that property was taken from prosecuting witness by force or intimidation and against his will.

### Robbery—Evidence.

4. In robbery case, where defendant was charged with taking a note from prosecuting witness, defendant denying that there was any note, the state was entitled to show that the note described in the indictment was placed in the hands of a bank for collection.

### Witnesses—Impeachment—Conviction of Crime.

5. The court properly sustained an objection to a question on cross-examination of prosecuting witness as to whether he had been indicted charged with the crime of murder, under Section 863, L. O. L., relating to impeachment; it not being contended that witness was convicted of a crime.

[As to impeachment of witnesses, see note in 14 Am. St. Rep. 157.]

### Criminal Law—Harmless Error—Cross-examination.

6. Error in sustaining an objection to cross-examination was cured by subsequent answers of the witness giving the desired information.

### Witnesses—Cross-examination.

7. Where prosecuting witness, in a robbery case, undertook to relate all that he did, as well as all that defendant did, defendant having held the witness a prisoner for more than a day, defendant was entitled to conduct a searching and exhausting cross-examination, concerning not only the prominent features, but also the minute details of the story.

### Witnesses—Impeachment.

8. In view of Section 863, L. O. L., a witness could not be asked, "Now, from your experience with the boy during those six weeks that you were so closely associated with him, are you in a position to say whether or not the statements of that boy are reliable," to impeach the boy, who was nearly 15 years of age.

Criminal Law—Evidence—Other Crimes.

9. In robbery prosecution for taking a note, it was admissible to introduce evidence concerning the taking of a deed, where there was evidence in the record from which the state could argue to the jury that the accused conceived the single plan of securing possession of both the note and the deed, both having been taken in the course of a day and a half, in which time the prosecuting witness was held prisoner by the accused.

Criminal Law—Evidence—Other Crimes.

10. Evidence which is relevant to the issue is not made inadmissible merely because it tends to prove the commission of another crime.

Criminal Law—Opinion—Signatures.

11. A bank president, who had seen signatures on checks which had been charged against an accused, possessed the qualification, required by Section 787, L. O. L., to testify that a certain signature was that of the accused.

Criminal Law—Evidence—Res Inter Alios Acta—Check Stubs—Correspondence.

12. Correspondence and check stubs which an accused had never seen or known of were inadmissible in evidence against him.

Criminal Law—Evidence—Case in Chief.

13. In a prosecution for robbery, where defendant was charged with taking a note, it was competent to show as a part of the state's case in chief that accused had cashed a check at a bank; prosecuting witness having testified that the note taken was given to cover, among other things, a loan made by giving the defendant such a check.

From Deschutes: T. E. J. DUFFY, Judge.

Department 2.

Mrs. J. J. Bailey appealed from a conviction of robbery. The indictment charges that Mrs. J. J. Bailey did on February 26, 1917,

"feloniously take from the person of L. A. Rawlings, against his will and by force and violence, and by putting him, the said L. A. Rawlings in fear of bodily injury to his person, a certain promissory note in writing, described as follows, to wit:

"A promissory note for the sum of five hundred dollars bearing date, Bend, Oregon, December 11, 1916, due one day after date, payable to the order of L. A. Rawlings at the First National Bank of Bend,

Oregon, and signed by Mrs. J. J. Bailey, with in-
dorsements thereon as follows: Secured by a lien on
fourteen (14) cows and one blooded bull in the pos-
session of Mr. Lawson, said note being on the form
used and furnished by the First National Bank of
Bend, Oregon, and being the property of said L. A.
Rawlings."

                                    REVERSED AND REMANDED.

For appellant there was a brief over the names of
*Mr. Ross Farnham* and *Mr. N. G. Wallace,* with an
oral argument by *Mr. Farnham.*

For the State there was a brief and an oral argu-
ment by *Mr. H. H. De Armond,* District Attorney.

HARRIS, J.—Because of the questions presented
by several of the 39 assignments of error, it will be
appropriate to introduce the discussion with a state-
ment of some of the conceded facts and also with a
recital of a considerable portion of the evidence.
The defendant and L. A. Rawlings are residing on
neighboring homesteads located on the High Desert
about 45 miles east of Bend. Rawlings entered upon
his homestead in 1910 and Mrs. Bailey's husband en-
tered upon the Bailey homestead probably in 1912.
Rawlings lived alone; he called his place the Harney
Holes Ranch. The Bailey home is about a mile and
three quarters east of the Rawlings residence. There
is evidence tending to show that Rawlings was a fre-
quent visitor at the Bailey home. Mrs. Bailey's hus-
band worked for a sheepman, and his employment
kept him away from home most of the time, so that
during the greater portion of the time Mrs. Bailey
was alone with her son Oscar Whitney. Rawlings
was between 65 and 72 years old; the defendant was

about 36 years of age; and Oscar Whitney's four-teenth birthday occurred on January 10, 1917.

According to the story told by Rawlings, "about the early part of the year" 1916 Mrs. Bailey told him "that when she got the money, she wanted my ranch." He testified that afterward, in the latter part of November, or the first part of December he was passing the Bailey ranch

"one day and she stopped me and showed me a forty-five hundred dollar check on a San Francisco Bank. * * She says you can make the deed out now for the ranch,—and I says, I told her,—there is no use being in a hurry, if you got the money to pay for it she is sold; but I says not until you have got the money. There is nothing doing."

Proceeding with his narrative, Rawlings told the jury that subsequently, on or about December 11, 1916, Mrs. Bailey represented to him that

"she was buying a bunch of cattle, and that they was in the possession of one Lawson living over on Crooked River, that they was fourteen (14) cows and one bull, and she said that there was a mortgage on them for five hundred dollars, and that she only had three days to raise the money to keep them from taking the property under the mortgage."

Rawlings also stated that Mrs. Bailey explained that in order to prevent a certain person with whom she had been litigating from getting "this money" she intended "to put the forty-five hundred dollar check in the First National Bank of Bend through Judge Ellis"; and that she said that if he would loan her $500

"she would pay it back when,—after that check got back,—when they told her that San Francisco check had been collected."

Rawlings claims that relying on what she said about the forty-five hundred dollar check he gave her a check for $500 on the First National Bank of Bend and that she gave him her promissory note for that amount; and that he wrote on the end of the note these words: "secured by a lien on fourteen cows and one blooded bull, all of which are now in the possession of one Mr. Lawson." There is evidence tending to show that on December 12, 1916, a check for $500 signed by L. A. Rawlings was presented to the First National Bank of Bend and that the bank honored it by paying $200 in cash and placing $300 to the credit of "Mr. or Mrs. J. J. Bailey." Rawlings asserted that the check which he gave to Mrs. Bailey was paid, because the bank returned it to him along with other paid and canceled checks.

Among the exhibits received in evidence is a deed marked Plaintiff's Exhibit "E." This instrument is dated December 19, 1916, is signed by Lee Alexander Rawlings and purports to convey the Harney Holes Ranch to Mrs. Bailey for the expressed consideration of $3,200. There is evidence tending to show that on the day when this deed was executed, or on the following day, Rawlings delivered the deed to Mrs. Bailey and that she gave him a check on the First National Bank of Bend for $3,870. Rawlings says that this check covered the following three items: $3,200, the purchase price of the Harney Holes Ranch, $170 the sum to be paid for "the horses, harness and other things" and $500, the amount of the note which had been given by Mrs. Bailey. Rawlings claims that he mailed the check to the bank and that the bank returned the check to him by the next mail "along just before Christmas" because it was

"no good." Rawlings says that he then "took the check back to her (Mrs. Bailey) and told her that she would have to fix it up." According to the evidence relied upon by the prosecution, Mrs. Bailey "said we would come down [to Bend] and fix up that returned check." Rawlings testified that

"we did set a date to go down and then she couldn't go down that day, or she said she couldn't go that day";

and that she afterwards returned the deed to him.

"After Mrs. Bailey had gotten back" the thirty-eight hundred and seventy dollar check, she told Rawlings, according to his testimony, that the forty-five hundred dollar check drawn on the San Francisco bank had been cashed and "that the money was in the bank"; and he says that subsequently on January 11, 1917, he sent the check by mail to the First National Bank of Bend for collection. Mrs. Bailey made a trip to Portland. Rawlings stated that upon her return from that trip "she asked me to send in and get the note; that she wanted to pay it off"; and that in compliance with her request he wrote to the bank on February 12, 1917, to return the note to him. The bank mailed the note to Rawlings and he "sent her word by one of the neighbors" that he "had the note"; and two or three days afterward, on Sunday, February 25th, Oscar Whitney came to Harney Holes Ranch and told Rawlings

"that his mother wanted me to come up and bring the note, and that she wanted to settle it."

Rawlings testified that on the following day, Monday, February 26, he rode over to the Bailey ranch for the purpose of collecting the five hundred dollar note. Rawlings entered the house upon Mrs. Bailey's in-

vitation and after he had been there a short time he started to leave and then, according to his testimony, Mrs. Bailey "grabbed" him and with the aid of the boy, Oscar Whitney, tied his hands and feet and sat him "down in a chair." To use the language of Rawlings,

"I was in a very bad state of health and I found out that I was very weak, and that they could handle me."

Rawlings says that he succeeded in disengaging his hands and that he cut the rope from his feet and in the words of the record,

"I got up and got to the door again, and it was fastened, or at least I couldn't get it open, and she came up behind me again, and then she bound me again."

This witness also told the jury that Mrs. Bailey attempted to force him to drink a drug which, according to the testimony of the boy, was laudanum. Rawlings claims that after he had been bound the second time and while his hands and feet were tied Mrs. Bailey took the five hundred dollar note and the canceled check for which the note had been given from his inside vest pocket and then "burned them up." He says, too, that after Mrs. Bailey burned the note and check "she was trying to gag" him and he "didn't want anything like that" and so he told her that he would not try to get away if she would untie him and if she would not gag him; and according to his story he was then released. The narrative recited in the record tells that Rawlings was in the Bailey house from the time of his arrival there at 10 o'clock Monday morning until about 8 o'clock Tuesday night when Mrs. Bailey, Rawlings and the boy saddled their horses and rode to Harney Holes

Ranch. If the testimony of Rawlings is to be believed he remained a prisoner in the custody of Mrs. Bailey even while riding home, for he says that before starting Mrs. Bailey fastened a rope to his horse's bridle and led the horse on which he was riding all the way to Harney Holes Ranch. When they arrived at Rawlings' house the door was unlocked, the lamp was lit, Rawlings built a fire and while Mrs. Bailey "stood guard" the boy searched the house and finally found and took from a trunk the patent to Harney Holes Ranch and also the deed which Mrs. Bailey had previously returned to Rawlings. Mrs. Bailey and the boy then returned to their home, taking the deed with them. She was arrested in March, 1917, and at that time delivered the deed to the officer.

Mrs. Bailey denied that she had exhibited a forty-five hundred dollar check to Rawlings, or that she had borrowed $500 from him, or that she gave him a note for $500, or that she had ever delivered to him a check for $3,870, or that she had bound or imprisoned Rawlings. She explained her possession of the deed by saying that Rawlings had given the instrument to her with the understanding that when her husband returned she and he were to execute and deliver a note for $1,000 to Rawlings in payment of the deed; and that she had refrained from recording the deed because she did not think she was entitled to do so until she and her husband first gave the note.

1, 2. The defendant insists that the court should have directed a verdict of not guilty for two reasons: First, because the prosecution failed to prove the existence and identity of the note described in the indictment; and second, because the state failed to prove sufficient facts to constitute the crime of rob-

bery. The first branch of this contention is really based upon the notion that where different witnesses give different and conflicting descriptions of an object seen by them, then their evidence, if believed, necessarily results in proving the existence of as many different objects as there are different and conflicting descriptions. L. A. Rawlings described the note in detail and his evidence alone was sufficient, if believed by the jury, to prove the existence and the identity of the note. He told the jury that Mrs. Bailey and Oscar Whitney came to his house about 9 o'clock on the morning of December 11, 1916; that the First National Bank of Bend had sent him three blank notes and that he used one of those blanks; that he filled in the blanks with a pencil and that Mrs. Bailey signed her name with the same pencil. In the printed brief it is said that:

"Rawlings was shown by the district attorney a blank form of note, yellow in color, used by the First National Bank of Bend, Oregon, and he testified that the note in question was on such a form."

Oscar Whitney testified that he not only saw the note on the day when it was executed but that he also saw and read the note "when we took it away from him"; that the paper was yellow in color; that Rawlings filled out the blanks with a little indelible pencil; that it was a First National Bank note; that the note was executed "along about 5 or 6 o'clock in the evening on Sunday, December the tenth"; that aside from the writing in the blank spaces and the signature at the bottom of the note there was no writing on the instrument except "that cattle business * *— it was just at the sign end of the note."

F. W. Merrill and his wife testified that in February, 1917, Rawlings showed them a note purporting to be signed by Mrs. Bailey. Their description of the note shown to them corresponded with the description given by Rawlings, except that Mr. Merrill thought that the paper was white and that it was "just a regular note form" and that he was "not so positive that it was on a bank form" and that the writing had been done with a pen and ink although "it may be that the entire note was written with pencil," and except that Mrs. Merrill thought that the paper was white and that the writing, including the signature, was in ink but that, she thought that the "indorsement" about the cattle had been written with a pencil.

C. S. Hudson, the president of the First National Bank of Bend, stated that, as he remembered it, the note which Rawlings sent to the bank for collection "was one of these notes that come in these little books" but that "it might have been" one of the blank notes from the bank.

There was evidence which, if believed, tended to show that each of the five witnesses saw the same alleged note. At all events the testimony of Rawlings was alone sufficient to carry the case to the jury.

Oscar Whitney's version of the actual taking of the note was different from that given by the prosecuting witness. The boy says that soon after Rawlings came into the house the latter asked his mother if she was "ready to settle for the note" and that she told "him to keep still about the note or she would do away with him." Oscar Whitney further testified that after Rawlings had been tied his mother asked Rawlings "if he had the note, and he said he

had it in the bank'' and that when Rawlings refused
to write a letter directing the bank to return the note
''she went and got some laudanum and whiskey and
brought it out there and said she was going to give
it to him * * because he would not write''; that
after she failed in her attempt to administer the lau-
danum and whiskey and Rawlings had again refused
to write ''she said she was going to throw him in the
well,'' but that he (the witness) persuaded his mother
not to do it because ''there was twelve feet of snow
in the well.'' The boy says that during the night and
about 1 o'clock Tuesday morning his mother took the
note away from Rawlings ''when he was scribbling
on something over on the bed there.''

The account given by Rawlings and the story told
by the boy of what occurred at Rawlings' house on
the night of February 27, 1917, disagree in several
particulars. The conflict between the testimony of
Rawlings and that of Oscar Whitney as to the time
and circumstances of the taking of the note and as to
the particulars connected with the taking of the deed,
and the conflict, if it can be said to be a conflict be-
tween any of the witnesses as to the color of the
paper, or as to the kind of blank form used, or as to
whether a pen or a pencil was used, were all circum-
stances which, though entitled to be considered in de-
termining the credibility of the witnesses, were
nevertheless not available in support of a motion for
a directed verdict; for discrepancies between the wit-
nesses called by a plaintiff do not of themselves en-
title a defendant to a directed verdict: *Kaufman* v.
*Bush,* 69 N. J. L. 645 (58 Atl. 291); *Wassermann* v.
*Sloss,* 117 Cal. 425 (49 Pac. 566, 569, 59 Am. St. Rep.
209, 38 L. R. A. 176); *Bush* v. *Wood,* 8 Cal. App. 647

(97 Pac. 709, 710); *Archibald Est.* v. *Matteson,* 5 Cal.
App. 441 (90 Pac. 723, 725).

3. The second branch of the contention that the defendant was entitled to a directed verdict is based upon the claim that there was insufficient evidence to show that the note "was feloniously taken from the prosecuting witness by force or intimidation and against his will." The testimony of Rawlings was, if believed, sufficient to establish all the elements of robbery; for according to his testimony the alleged note was taken from his person while his feet and hands were tied; and, while it is true that he said that he was "not very scary" and that he did not desire to use any more force than was necessary it is also true that in response to the question, "Were you then laboring under any fear whatever that you would receive or suffer violence and bodily harm at the hands of this defendant, Mrs. J. J. Bailey?" he gave this categorical answer: "I was." He testified, too, that she threatened to put him in the well and attempted to administer poison to him. Manifestly, there was evidence tending to show not only force and violence but also fear of force and violence: See 34 Cyc. 1803, and note. The crime of robbery is made out by proving that property was taken from the person by some one or more of the means enumerated in the statute: *State* v: *Lawrence,* 20 Or. 236, 239 (25 Pac. 638).

4. It was not error to permit the prosecution to ask Rawlings whether he placed the note in the hands of the bank for collection. The state was entitled to trace the note, if there was one, from the time of its execution until its destruction. This assignment of error is utterly without merit.

5. On cross-examination Rawlings was asked this question: "Were you ever indicted in the State of

Texas and charged with the crime of murder?'' It is not contended that Rawlings was convicted of a crime. The court properly sustained the objection: Section 863, L. O. L.

The interrogatory embraced in assignment No. 8 was argumentative. The argument contained in this interrogatory might properly be suggested by counsel when addressing the jury. The court ruled correctly in sustaining an objection by the prosecution.

It was error to refuse to permit the defendant to ask Rawlings upon cross-examination whether there was ''a lamplight'' in the room during the night. However, the error was afterward cured by the answer of the witness found on page 137 of the Transcript of Testimony.

6, 7. Another assignment of error arises out of the refusal of the court to permit Rawlings to say on cross-examination whether during the time he was in the Bailey house he was where he ''could see whether or not the others there had anything to eat.'' The defendant was entitled to an answer to this question. The error was subsequently cured by answers giving the desired information; but the necessity of a reversal prompts us to refer to the subject so that error may be avoided at the next trial. The prosecuting witness had told his story on direct examination about being kept a prisoner in the Bailey house from 10 o'clock Monday morning until about 8 o'clock Tuesday night and he had undertaken to relate all that he did as well as all that was done by Mrs. Bailey and the boy; and hence it is obvious that the defendant was entitled to conduct a searching and exhaustive cross-examination concerning not only the prominent features but also the minutest details of the story.

8. The court refused to permit the defendant to ask Oscar Whitney on cross-examination, this question:

"What was done in connection with Mr. Roberts bringing you in here for breaking into the house out there on the High Desert?"

Ivan Knotts testified that Oscar Whitney worked for him for about six weeks commencing with the middle of August, 1917. The defendant complains because the court refused to permit this witness to answer the following question:

"Now from your experience with the boy during those six weeks that you were so closely associated with him, Mr. Knotts, are you in a position to say now whether or not, whether or not the statements of that boy are reliable or not?"

The defendant argues that because of his age the boy could not have a general reputation "as he has had no dealings with business or social life of the community upon which to base a general reputation"; and that therefore "in order to impeach a boy of that age" it was competent to ask the quoted questions. The trial occurred in October, 1917. The witness was nearly 15 years of age at the time of the trial, his fourteenth birthday having occurred on January 10, 1917. Oscar Whitney was a competent witness under the statute. The statute points out how a witness may be impeached: Section 863, L. O. L. Neither one of the interrogatories complied with the statute; and hence there was no error in sustaining the objections of the prosecution.

9, 10. The defendant contends that the court erred in receiving the deed, Exhibit "E," in evidence; and also that it was prejudicial error to permit Rawlings and Oscar Whitney to tell about taking the deed from the trunk, on the theory that

"the only possible effect of the admission of this testimony and exhibit was to place before the jury matters tending to cause them to believe that the defendant was guilty of the commission of another unrelated crime at about the same time and thus prejudice their minds against the defendant."

The reader can better understand the question to be decided if attention is first called to some additional evidence found in the record. There was testimony from which the jury could infer that Rawlings had told Mrs. Bailey that the deed was in the bank at Bend, although the boy stated that she had been to Bend and upon making inquiry had been told at the bank that this deed was not there. Oscar Whitney testified that they "all got up about 5 o'clock," Tuesday morning, February, 27th, and "then she tried to make him, she tried to get him to write down for the deed"; that

"he didn't want to write for the deed in his own handwriting,—and he wouldn't write to suit her, and she would tear the note up and then she would get him to write it again, and he did it three or four different times, but he wrote different kinds of handwriting, and she didn't like it and she wouldn't use any of them."

There was evidence in the record from which the state could argue to the jury that Mrs. Bailey conceived the single plan of securing possession of both the note and the deed; and that this single plan was at first partially executed by taking the note and then consummated by taking the deed. Strictly speaking the taking of the deed was not an independent offense disconnected from and unrelated to the crime charged in the indictment. The taking of the note was the beginning while the taking of the deed was the ending of a single transaction. It was competent to tell the whole story to the jury and it was impossible to do

90 Or.—41

that without relating what took place at the Harney Holes Ranch as well as what occurred in the Bailey house: *State* v. *Von Klein,* 71 Or. 159, 165 (142 Pac. 549, Ann. Cas. 1916C, 1054). See, also: *State* v. *Roberts,* 15 Or. 187, 195 (13 Pac. 896); *State* v. *McDaniel,* 39 Or. 161, 173 (65 Pac. 520). It was competent to show that Rawlings was held a captive from Monday morning until left alone in his own house Tuesday night; and this part of the tale was not rendered incompetent by reason of the fact that the chapter about the deed is included in it and is a component part of it. Such evidence is received, not because it tends to prove another crime, but because it is relevant to the issues raised by the indictment and the plea of not guilty. Evidence which is relevant to the issue is not made inadmissible merely because it tends to prove the commission of another crime: *State* v. *Marshall,* 77 Vt. 262, 272 (59 Atl. 916); *People* v. *Rogers,* 192 N. Y. 331 (85 N. E. 135, 15 Ann. Cas. 177, 183); *Commonwealth* v. *Snell,* 189 Mass. 12 (75 N. E. 75, 3 L. R. A. (N. S.) 1019, 1032). No error was committed in receiving evidence concerning the deed.

11. After the prosecuting witness had told about sending the five hundred dollar note to the First National Bank of Bend, C. S. Hudson, the president of the bank, was called as a witness for the state and was permitted to testify that the bank received from Rawlings a note for $500 signed by Mrs. J. J. Bailey and that he believed that the signature was that of the defendant. It is contended that the witness was not qualified to speak of the genuineness of the signature. Section 787, L. O. L., reads as follows:

"The handwriting of a person may be shown, by anyone who believes it to be his, and who has seen him write, or has seen writing purporting to have been his, upon which he has acted or been charged,

and who has thus acquired a knowledge of his handwriting."

Hudson stated that the signature of Mrs. Bailey was on file "as one of our customers in our signature case"; that Mrs. Bailey had an account with the bank prior to the receipt of the note and that seventeen checks had been issued on that account; that if any of those checks were mailed to the bank he saw them because the mail came to him "first" and he opened the letters. If, as is usually done by a customer opening an account with a bank, Mrs. Bailey left a sample of her signature with the First National Bank of Bend, and if checks were drawn upon her account and paid by the bank and charged against her account without objection by her, and if Hudson saw the signature in the signature case and the checks or either of them and thus acquired a knowledge of Mrs. Bailey's handwriting, he unquestionably possessed the qualifications required by the statute.

12. Several assignments of error arise out of rulings of the court admitting letters which passed between the bank and Rawlings; and one assignment of error relates to a check stub received in evidence. When Rawlings sent the check for $3,870 to the bank he inclosed the check with a letter which he addressed to the bank. The letter reads as follows:

"Brothers, Ore., Dec. 21, 1916.
"First National Bank, Bend, Ore.

"Mr. Cashier: Find enclosed check $3870—Collect & cr to me

For Harney Holes Ranch.............$3200.
" loan on 14 cows................ 500.
" Horse, wagon & harness......... 170.

$3870.

"Kindly let me know of acceptance at once.
"Oblige, L. A. RAWLINGS."

When Rawlings sent the five hundred dollar note to the bank he mailed with it the following letter, dated January 11, 1917:

"First National Bank, Bend, Ore.

"Mr. Huson find Mrs. J. J. Bailey note for the $500—I loaned her to buy the Lawson cows. 14 & 1 bull. less $300—the ballanc of purchase price $800— I fixed note that way so she could get the $300 vallance from you, which her check book indicated she also owes me for horse, wagon & harness. She owes me the full face value of this note $500—I returned chk & got back *deed* I think she ment alright about giving chk you sent back. She will be down in a few days & said she would me all $670—you collect for me.

"L. A. RAWLINGS.

"over"

"Mrs. Bailey chk to Elsie Bailey on a san francisco Bank was the basis on which I done *bus*—with her. She says it is collected. May take ranch later."

On January 17, 1917, Rawlings again wrote to the bank, thus:

"Mr. Hudson I sent you Mrs. Bailey's note, for $500—did you get it? She said she would leave money at your bank. Did she do it? The note was of even date with the check I loaned to by the Lawson cows. note is secured by lien on cows. Please let me know.

note............$500—<br>horse, wagon & harness 170—

$670—in all.

"let me know what she did about it; did you collect her san francisco check through Judge Ellis: for her."

The letter which Rawlings wrote on February 12, 1917, requesting the bank to return the note reads as follows:

"Mr. Hudson, that mysterious Mrs. Bailey wants to settle that note & acct. here. Please send if possible

me that her note by Saturday 17th mail to Brothers, Ore. and oblige.

"L. A. RAWLINGS.

"I am trying to get my money.

"Lots of trouble."

The bank addressed a letter to Rawlings on January 16, 1917, acknowledging "receipt of your letter of the 11th, inclosing note of Mrs. J. J. Bailey in your favor for $500."

Under date of January 24, 1917, the bank acknowledged receipt of Rawlings' letter of "Jan. 17th"; and on February 17th the bank wrote to Rawlings saying:

"We inclose note of Mrs. J. J. Bailey in your favor for $500."

Rawlings produced a check-book containing a stub in which was written the date "Dec. 11, 1916," and also the following:

"Pay to Mrs. J. J. Bailey—loaned on 14 cows & Bull—this check 500."

All this correspondence between the bank and Rawlings and the check stub were received in evidence over the objection of the defendant. There is not a word of evidence to show that Mrs. Bailey ever saw or even heard of any of these letters or the check stub until the time of the trial. The circumstances surrounding the letter mentioned in *State* v. *McDaniel,* 39 Or. 161 (65 Pac. 520), relied upon by the prosecution, are not in the remotest degree analogous to the situation here. If the record speaks the whole truth then it can be said that Mrs. Bailey was totally ignorant, until the time of the trial, not only of the contents of the letters and check stub but also of the fact of the existence of the papers. The introduction of the check stub and the correspondence between the bank and Rawlings can-

not on the facts appearing in the record be sustained by any established rule of evidence: 10 R. C. L. 1147; 16 Cyc. 945. It was prejudicial error to receive the letters and check stub in evidence.

13. The prosecution proceeded upon the theory that the testimony of Guy McReynolds was not competent as a part of the state's case in chief. This witness testified in substance that on December 12, 1916, as cashier of the First National Bank of Bend, he cashed a check for $500, charged the amount to the account of Rawlings, and that a portion was "deposited to Mrs. J. J. Bailey according to the records here." It was competent to show that Rawlings gave a check to Mrs. Bailey for $500; and that testimony was properly a part of the state's case in chief. It was competent to show what was done with the check and that Mrs. Bailey cashed it, if she did, and that testimony was just as much a part of the state's case in chief as was the evidence concerning the execution and delivery of the check. If upon a retrial the state offers any evidence concerning the cashing of the check it should be introduced as a part of the state's case in chief.

The judgment is reversed and the cause is remanded for a new trial.      REVERSED AND REMANDED.

BEAN, BENSON and JOHNS, JJ., concur.