Argued January 8, affirmed January 29, 1958

# STATE OF OREGON *v.* DIXON
### 321 P. 2d 305

*LaVerne M. Johnson* argued the cause for appellant. On briefs were Huston, Thomas & Johnson, Corvallis.

*John Fenner,* District Attorney, and *J. Alfred Joiner,* Deputy District Attorney, Corvallis, argued the cause and filed a brief for respondent.

Before LUSK, Presiding Justice, and ROSSMAN, WARNER and KESTER, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment of the circuit court which adjudged him guilty of the crime of robbery, not armed with a dangerous weapon (ORS 163.290), and sentenced him to imprisonment for a term of one year.

In appealing, the defendant submits eight assignments of error. Before giving them attention we will state pertinent facts. The defendant was 17 years of age at the time of the alleged crime, June 8, 1956. Upon the evening of that day, he and four companions of corresponding age were riding around in the defendant's automobile in the vicinity of Monroe, which is in Benton county. His companions were Jack Wall,

Keith Baucher, Louie Kaping and Clifford Sullivan. About 11:00 p. m., the defendant saw ahead of him a car which was traveling in the same direction as his and whose driver, it later developed, was Arlie E. Sheppard, to whom we will refer frequently. After the defendant had seen the car ahead he proposed, according to Sullivan, aforementioned, "Let's pull him over." When the proposal met with favor, the defendant drove his car into close proximity of Sheppard's, blinked his lights and then two of his companions thrust their heads out of the car's open windows and made a noise like the siren of a police car. At that juncture Sheppard drove to the side of the road and stopped. The defendant, as a witness, testified that he thought the driver of the car ahead was Francis Bales, a friend of his, and that his purpose was to play a prank upon Bales. He swore that when he projected his proposal to stop the car ahead, his words were "There's Francis Bales. Let's stop him."

After the Sheppard car had drawn to the side of the road, the defendant stopped his to its rear and then, upon walking to Sheppard's open window, demanded that he be shown the driver's license. Sheppard complied with the demand and in so doing exposed his wallet to the defendant. Next, the defendant declared, "Your taillights is out." The defendant testified that at that juncture the occupant of the accosted automobile spoke and that when he (defendant) heard the voice he realized that the person was not Francis Bales. According to the defendant, he thereupon said something about a mistake and started back to his car.

Sheppard testified that after he had been told "Your taillights is out" he answered, "Well, they wasn't just a few minutes ago." Then, according to

Sheppard, the defendant replied, "They are now. \* \* \*
If you don't fix them we are going to have to take
you to court in Monroe." Since Sheppard knew that
no court was held in the small community of Monroe,
he protested, so he testified, "What's going off here,
there's something fishy," and started to get out of
his car. Then, if he told the truth, the defendant sum-
moned one of his companions and in so doing, stated,
"Well, he don't believe what I'm telling him. \* \* \*
We'll take his license number." About that time the
defendant moved toward the rear of Sheppard's car
and Jack Wall, aforementioned, came forward. Shep-
pard swore that just as he got out of his car Wall struck
him a blow which knocked him against a part of the
open door of his car whereby he was stunned and fell
to the ground. He claimed that when he was down,
one of his assailants kicked him in the jaw and "it
practically knocked me out." The defendant and Wall
conceded that Sheppard's head struck the door of
his car as he fell, but each asserted that Wall had
not struck him; they said he merely gave him a shove.
The defendant, referring to Sheppard as he lay upon
the ground, testified: "He wasn't out cold." Both
denied that either kicked Sheppard. The latter swore
that immediately following his fall to the ground four
of the occupants of defendant's car pinned him to the
ground while one of them took his wallet. According
to his account, Wall, while the defendant was "standing
right there," removed the contents of the wallet and
then threw the empty container into Sheppard's car.
At that point Sheppard was permitted to regain his
feet and the defendant thereupon ordered him to "get
going," so the victim swore.

The defendant denied that he held Sheppard to
the ground. According to him, he helped Sheppard

arise and was wholly ignorant of the taking of the wallet.

Sullivan corroborated Sheppard's testimony. He swore that Wall hit Sheppard, and not merely shoved him. According to that witness, the defendant held Sheppard to the ground while one of the group took his billfold. His words were: "Bob Dixon held him down and then somebody took his billfold." By the name of Bob he referred to the defendant. After the billfold had been taken, Wall, so Sullivan said, walked to the front of the defendant's car and there, with the aid of its lights, examined the billfold's contents and removed its money. In the meantime, according to Sullivan, the defendant continued to hold Sheppard to the ground. Next, "Jack (Wall) threw his billfold back in the car," so Sullivan swore, "and Bob let Mr. Sheppard up and Mr. Sheppard got back in the car and Bob told him to take off." In the following testimony we are told by Sullivan what took place after the defendant and Wall were back in the car:

"A Well, they were just talking about the money that they got from him.

"Q Now, 'they were talking.' What do you mean 'They'?

"A Well, Jack and Bob.

"Q And what did they say about the money?

"A Well, they just said they'd split it up with us.

"Q Did they?

"A Yes."

Sullivan testified that when Wall re-entered the car he announced that he had obtained six dollars from Sheppard's wallet, and thereupon divided the money by keeping two dollars and giving one dollar to each of the other four occupants.

The defendant's brief claims that Sullivan's testimony is consistent with an interpretation that the defendant could "have been helping Arlie E. Sheppard up as holding him down." The brief, referring to Sullivan, says: "He, in fact, did not know which was occurring." The contention is based upon the following part of the testimony given by Sullivan upon cross-examination:

"Q Now, isn't it true that Robert here went back and was trying to pick up Mr. Sheppard and help him up, didn't he do that?

"A Well, he had his hands on him. I thought that he was holding him down.

"Q You don't know, do you, what he was doing there?

"A Well, he didn't get him up if he was trying to help him up.

"Q But you don't know whether he was holding him down or trying to help him up.

"A Not for sure."

In view of the fact that the witness had testified "Bob Dixon held him down and then somebody took his billfold," we do not believe that the part of Sullivan's testimony upon which the defendant depends means that the defendant helped Sheppard—if he helped him at all—until his wallet had been taken. It will be recalled that Sheppard swore he was not permitted to arise until his wallet had been taken.

Louie Kaping, aforementioned, as a witness for the state, gave testimony in substantial accord with Sullivan's.

Wall, as a witness for the defendant, in referring to Sheppard, testified:

"I seen this guy getting out of the car so I thought he was chasing after Bob and I didn't want any trouble, so I gave him a push and he fell down."

Wall swore that it was Baucher who took Sheppard's wallet and distributed its contents. According to him, the defendant, upon being handed one dollar of Sheppard's money, returned it with the request, "You just keep the money, I'll put in on gas later." After the Sheppard episode, the defendant drove to a service station and purchased gasoline.

As a witness, the defendant admitted that he saw Sheppard fall and that after he had reseated himself in the car he knew that some money had been taken. He also admitted that before the theft he saw Sheppard's billfold. According to him, Sheppard kept his driver's license in his billfold and brought the latter into view when he produced the driver's license, and did so again when he later put it away. The defendant claimed that he was unaware of any plan to take money until after the appropriation had been made, and admitted that one dollar was handed to him, but swore that he returned it; he acknowledged that when he did so he stated that it would be used for the purchase of gasoline.

The foregoing will suffice for the present as a statement of the evidence.

■ The first assignment of error is based upon the fact that cross-examination of the aforementioned Sullivan (a witness for the state) revealed that during a noon recess of the trial, which interrupted the direct examination of the witness, the latter and the district attorney had a visit, in the course of which the district attorney reminded Sullivan of some statements which he had made previously. The statements, if we correctly discern the situation, concerned two conversations which Sullivan and the defendant had, one prior to and the other following the Preliminary Hearing. Sullivan, like the defendant, was an indictee. Prior to

the noon recess, Sullivan, upon direct examination by the district attorney, testified that he and the defendant had a conversation concerning the events of June 8, 1956, and gave the following as his account of the conversation:

> "Well, he didn't say much about it. He just kind of mentioned it. * * * I can't even hardly remember it, it's been so long."

It then developed that the conversation which he had just mentioned occurred prior to the Preliminary Hearing. Following the latter, Sullivan had another conversation with the defendant and, when asked by the district attorney, "What did Bob Dixon tell you at that time?", answered, "He didn't tell me anything." Then came the noon recess, after which Sullivan was again asked concerning his first conversation with the defendant and again answered that he recalled nothing of it. As to the second conversation, he answered:

> "Well, he just asked us what we told our lawyer, and who our lawyer was, and he told us what his story was, and he asked us if we were going to tell ours that way."

By the pronoun "our" he referred to "me and Louie Kaping." The witness claimed that the foregoing was all that he could remember, apart from the fact that the second conversation occurred "across from the Monroe Tavern Cafe." The above represents all that Sullivan divulged upon direct examination concerning the two conversations. He revealed nothing more. Upon cross-examination, the fact was developed, upon which the defendant depends, that during the noon recess the witness and the district attorney had a visit in the course of which the district attorney reminded Sullivan of the account which he had previously given of his two conversations with the de-

fendant. The witness freely acknowledged that the noon-hour meeting occurred, but, referring to his report of his two conversations with the defendant, stated, "This is my own." He amplified the statement by explaining that the district attorney "just reminded me what Dixon said to me," but insisted that the district attorney "never told me to say that." After the cross-examination had disclosed the above situation, defendant's counsel moved that

> "the answers of this witness regarding the conversations that have been given since lunch be stricken because he's testified that they were given by reminding him by the district attorney. The witness can't refresh his memory in that manner; it's not proper."

The motion was denied. No error occurred when that ruling was made. *State v. Merlo,* 92 Or 678, 173 P 317, 182 P 153, and *Weygandt v. Bartle,* 88 Or 310, 171 P 587. This assignment of error reveals no merit.

■ The second assignment of error is based upon a contention that error occurred when the defendant's objection was overruled to the following question which the district attorney, upon redirect examination, propounded to the aforementioned Louie Kaping, a state witness:

> "Will you state whether or not Robert Dixon has asked you to change your story in regard to what occurred there that night?"

Kaping was an indictee. The objection to the question was:

> "I think the question is leading, Your Honor, and I'll object. * * * I want to emphasize that it's a leading question, counsel put words in the mouth of this witness, which calls merely for a yes or no answer, and it's a leading question."

The objection was overruled. No error thereby occurred. ORS 45.560. *State v. Frohnhofer,* 134 Or 378, 293 P 921; *State v. Merlo,* supra; *State v. Chee Gong,* 17 Or 635, 21 P 882.

■ The third assignment of error challenges a ruling which permitted the district attorney to propound the following question to Mr. Mark V. Weatherford, an attorney, who, according to his testimony, had told the mothers of Sullivan and Kaping that he would look out for their interests:

> "Now, has the district attorney, myself, made any threats or promises or any inducements to you in order to get your clients to testify here at this trial today?"

Defendant's counsel objected that the question was leading. For the reasons given in our disposition of assignment of error No. 2, we hold that the present contention is without merit.

■ The fourth, fifth and sixth assignments of error can be considered together. The fourth challenges an order which denied the defendant's motion for a dismissal. The fifth claims that error was committed when the trial court declined to direct the jury to return a verdict of not guilty; and the sixth complains because the trial judge did not give the jury the following requested instruction: "I instruct you to bring in a verdict finding the defendant not guilty." Rule 16 of the Rules of Procedure promulgated by this court (203 Or 709) says:

> "Assignments of error presenting the same legal questions are to be avoided."

Had the defendant-appellant observed that rule, his brief would have been shorter and he would have avoided needless expense in printing.

The defendant-appellant states the basis of these assignments of error in this way:

"* * * the state has failed to prove that Robert Dixon by force, violence, threats, or otherwise, took any money from the person of Arlie E. Sheppard as charged in the indictment. The state has further failed to prove that there was any conspiracy to obtain such money shared in by Robert Dixon and they failed to prove the necessary felonious intent. * * *

"* * * there is no evidence in this case showing a felonious intent on the part of Robert Dixon to rob Arlie E. Sheppard; there is no evidence of any conspiracy on the part of Robert Dixon with any other parties that were involved. The only evidence in this case is that Robert Dixon knew nothing about any money having been taken from Mr. Sheppard, that is, Arlie E. Sheppard, the man referred to in the Indictment, until after he had returned to the automobile and found that there was such a deed had been accomplished."

ORS 161.220 says:

"All persons concerned in the commission of a felony or misdemeanor, whether they directly commit the act constituting the crime or aid and abet in its commission, though not present, are principals and shall be indicted, tried and punished as principals."

ORS 163.290 says:

"Any person, not being armed with a dangerous weapon, who by force and violence, or by assault, or by putting in fear of force and violence or assault, robs, steals, or takes from the person of another any money or other property which may be the subject of larceny, shall be punished upon conviction * * *."

*State v. Bailey,* 90 Or 627, 178 P 201, holds:

"* * * The crime of robbery is made out by proving that property was taken from the person

by some one or more of the means enumerated in the statute: * * *."

Burdick, Law of Crime, § 599, says:

"* * * Consequently, it has become established that robbery is committed either by means of violence or by fear, or, as otherwise expressed, but, with the same meaning, the word 'force' being substituted for 'violence', either by force or by fear. In many robberies both violence (force) and fear are present, but only one of these elements is necessary, either being sufficient to constitute the crime. One may be struck down by an assailant whom the victim does not see or hear, and may then be robbed while unconscious. There is violence in such a case but no putting in fear."

The following is taken from 46 Am Jur, Robbery, p 150, § 25:

"* * * Generally, all who are present at the commission of a robbery, rendering it countenance and encouragement, and ready to assist should the necessity arise, are liable as principal actors. To be liable, the accused need not have taken any money from the victim with his own hands, or actually participated in any other act of force or violence. It is sufficient that he came and went with the robbers, was present when the robbery was committed, and acquiesced therein."

The defendant's acceptance of a part of the fruits of the robbery established his acquiescence in it. The state deems the defendant a principal.

We take the following from *State v. O'Keefe,* 23 Nev 127, 43 P 918:

"Appellant was tried, separately, upon an indictment charging him jointly with Charles Martin and Frank Conlan, of the crime of robbery, perpetrated upon the person of Jonathan Lees. It was shown that Lees and McDonald, during the

daytime, were in the front portion of a house occupied by McDonald, when a party of boys, among whom was the defendant, invaded the premises, separated the men, by driving McDonald to the rear, and detaining him there while the others robbed Lees of an inconsiderable sum of money. It was not definitely shown that defendant participated in the robbery, other than he came with the robbers, and left when they left, was present at the robbery, and apparently acquiesced therein. * * *

"* * * Upon the evidence, as we have seen, the jury could have found the defendant guilty of the robbery."

The jury actually found the defendant guilty of attempt to rob. The resulting judgment was affirmed.

The record contains substantial evidence capable of supporting findings to the following effect: (1) the defendant, while impersonating an officer, caused Sheppard to stop his car upon the side of the road; (2) when the defendant demanded that Sheppard produce his driver's license, his billfold was seen by the defendant; (3) the manner in which the defendant accosted Sheppard induced the latter to get out of his car and thereupon Wall, the defendant's companion knocked Sheppard to the ground; (4) when Sheppard, stunned by the blow which he had received and from striking his head against the open car door, lay upon the ground, the defendant held him there while Wall took the billfold and removed its contents; (5) the defendant shared in the fruits of the robbery.

It is our belief that assignments of error four, five and six lack merit.

■ The seventh assignment of error is based upon the following instruction which the court gave to the jury:

"It's not necessary for the state to prove all of

the matters that have been alleged as to the means of committing the alleged crime. They allege in the Indictment that it was by force and violence and by assaulting and putting into fear. Now, the proof, satisfactory proof, beyond a reasonable doubt of any one of those means would be sufficient as far as that phase of the case is concerned or this element."

The exception to the instruction was based upon a contention that "there is no evidence in this case that Arlie E. Sheppard was put in fear."

Sheppard did not stop his car voluntarily but under a belief that the sound which he heard came from a traffic officer's siren. Likewise, he did not display his driver's license through his own volition but because of a demand made by the defendant while he was impersonating an officer. Sheppard testified that the blow which he received rendered him "helpless," and added, "I just as well be out, I couldn't have been worse off." While he was in that condition and lying pinned to the ground by the defendant and others, the theft occurred, if the state's witnesses told the truth. Eventually, when he was permitted to regain his feet and his empty wallet had been thrown into his car, he was told by the defendant to "get going." He complied with the demand. We think that the facts established all of the needed elements of the crime which was charged against the defendant. The challenged instruction did not err. *State v. Bailey,* supra, and *State v. Lawrence,* 20 Or 236, 25 P 638.

■ The eighth assignment of error is based upon a contention that error was committed when the instructions to the jury authorized the latter to return a verdict of guilty of the crime of assault and battery. By virtue of ORS 136.660, the jury was empowered to

find the defendant guilty of "any crime the commission of which is necessarily included in that with which he is charged in the indictment." Simple assault and battery, as defined in ORS 163.260, was included, according to our belief, in the crime charged against the defendant. *State v. Carroll,* 155 Or 85, 62 P2d 830; and *State v. Houghton,* 46 Or 12, 75 P 822.

The above disposes of all the assignments of error. None of them, in our opinion, warrants reversal.

The challenged judgment of conviction is affirmed.