Argued April 2, affirmed September 5, petition for rehearing
denied October 8, 1963

# STATE OF OREGON *v.* PARKER

384 P. 2d 986

*Douglas J. White, Jr.,* and *William J. Sundstrom,* Portland, argued the cause and filed a brief for appellant.

*Oscar D. Howlett,* Deputy District Attorney for Multnomah County, argued the cause for respondent. On the brief was George Van Hoomissen, District Attorney for Multnomah County.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

O'CONNELL, J.

Defendant appeals from a judgment of conviction for the crime of murder in the second degree. This is defendant's second appeal. In *State v. Parker,* 225 Or 88, 356 P2d 88 (1960) we reversed a judgment of con-

viction for second degree murder because of error in admitting hearsay testimony.

Two of defendant's assignments of error require comment. These are (1) that the state failed to establish venue in Multnomah county where defendant was tried,[1] and (2) that the misconduct of state's counsel during his final argument to the jury deprived defendant of a fair trial.

Defendant was charged with killing Robert Holloway. Holloway's body was found in a well in Columbia county. Other facts are set out in detail in our former opinion. Defendant contends that there is no evidence of any acts committed by defendant in Multnomah county requisite to the consummation of the crime with which he was charged.[2]

There is no evidence tending to show in which county the fatal blow was struck or where Holloway died. However, there was evidence that defendant purchased whisky in Portland and that it was used by defendant to lure Holloway into an automobile in Portland for a trip from which he never returned. Violet Bostwick, a witness for the prosecution, testified as follows:

"Q All right. Now, did he [Parker] tell you anything else * * *

"A Well, he talked about—he told me that he had gotten Holloway into the car to take him.

---

[1] Art. I, § 11, Oregon Constitution provides as follows:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed * * *."

[2] ORS 131.340 provides:

"When a crime is committed partly in one county and partly in another or when the acts or effects thereof constituting or requisite to the consummation of the crime occur in two or more counties, an action therefor may be commenced and tried in any of such counties."

"Q  Did he tell you how he had gotten him into the car?

"A  Well, I asked him, I said, 'Well, how could —if you and Holloway and Keith were all arguing,' I said, I asked him how he could get Holloway into the car; and he said that they had, that he had gotten two fifths of whisky.  He said Holloway would go anywhere for a drink, and then he said that—well, anyway, he was—I don't remember his exact words, but I know he was angry at Keith because Keith had drank, because he said that Keith had drank most of the whisky."

The question presented is whether the described conduct is within the language of ORS 131.340, "acts or effects thereof constituting or requisite to the consummation of the crime."[3]

Similar statutes in other states have been variously interpreted.[4]  In some jurisdictions it is held that if the act committed in one county does not constitute an element of the crime charged, that county does not have venue.[5]  On the other hand, it has been held that the act in the county in which defendant is tried need not be an essential element of the crime.[6]

---

[3] See note 2 supra.

[4] See cases collected in Annotation: Construction and effect of statutes providing for venue of criminal case in either county, where crime is committed partly in one county and partly in another, 30 ALR2d 1265 (1953).

[5] See for example, State v. Rider, 46 Kan 332, 26 P 745 (1891).

[6] Thus in People v. Megladdery, 40 Cal App2d 748, 106 P2d 84, 98 (1940) the court explained:

"The interpretation contended for by respondent would completely disregard the phrase 'or the acts or effects thereof constituting or requisite to the consummation of the offense' contained in the section. Obviously, the phrase, 'or requisite to the consummation of the offense,' means requisite to the completion of the offense—to the achievement of the unlawful purpose—to the ends of the unlawful enterprise. By the use of the

■ In the present case defendant's acts in Multnomah county as described by witness Bostwick were not essential elements of the crime of second degree murder. But it is not necessary to determine whether ORS 131.340 is to be construed broadly as in *People v. Megladdery,* 40 Cal App2d 748, 106 P2d 84 (1940), or narrowly as in *State v. Rider,* 46 Kan 332, 26 P 745 (1891). There is another basis upon which venue in Multnomah county may be sustained. Defendant was indicted for the crime of first degree murder. An element of that crime is "deliberate and premeditated malice." ORS 163.010. If defendant had been tried upon the crime charged in the indictment, the evidence of defendant's conduct in enticing Holloway into the automobile in Portland would have been sufficient to establish premeditation. Thus, if in the original trial there had been a verdict of guilty of the crime of first degree murder, venue in Multnomah county would have been made out. However, the jury in the first trial returned a verdict of the lesser included crime of second degree murder. To say that venue was lost as a result of this fortuitous circumstance would attach a significance to the requirement of venue far beyond its purpose.

■ The retrial of the cause may be viewed in the same light. The reversal of the judgment and remand for a new trial in the first appeal operated to revest jurisdiction and venue in the Multnomah county circuit court, the original indictment continuing to serve as the basis for the charge, subject to the rule that the

word 'consummation' the legislature drew a distinction between an act or an effect thereof which is essential to the commission of an offense, and an act or effect thereof which, although unessential to the commission of the offense, is requisite to the completion of the offense—that is, to the achievement of the unlawful purpose of the person committing the offense."

defendant cannot be tried for a crime greater than that for which he has been convicted in the first trial. We hold that venue was properly laid in Multnomah county.

We now turn to the second of the assignments of error noted above. Defendant contends that error was committed when the state elicited from William Dana a statement that he had sold quick lime to someone on October 28, 1957, the day after the alleged murder. The evidence established that decedent's body was found in a well which contained lime. Violet Bostwick testified that defendant had "mentioned something about some lime, and he said that they had—I asked him what they used the lime for, and he said, 'To get rid of identification.' He said that he had, he had bought, he had been thinking about buying the lime at some small place and then he thought better about it and bought it at a large concern where there was more sales or more people coming and going and he figured it wouldn't have been noticed so much."

Later the state called William Dana, an employee of Masons Supply Company, who testified that he had sold a small quantity of quick lime to someone on October 28, 1957. He stated that "It is very irregular to just sell four sacks of hot lime to a cash customer such as this was" because "it has a limited use." He explained that hot lime "has to be slaked or hydrated, which means combining it with water, before it can be used, and very few people use it for—buy it before it has been slaked. Slaked lime is sold, as such, and you don't have to go through the process of boiling it out with water. That is why it is called 'hot lime'. It boils when you combine it with water." Dana stated that he could not remember having sold anything to defendant but that he had seen defendant in the Masons Supply

Company store on some occasion. It was established that Masons Supply Company was one of the largest building supply companies in the city.

On motion of the defense, Dana's testimony was stricken from the record on the ground that the testimony of the witness had not been connected in any way to the defendant. The jury was instructed not to consider the stricken testimony in their deliberations.

Dana's testimony was relevant and it would not have been error to submit it to the jury. The jury was entitled to believe Violet Bostwick's testimony that defendant bought hot lime at a "large concern." The Masons Supply Company was a "large concern." Small quantities of quick lime are not usually sold. A small quantity of quick lime was used upon the decedent's body. Defendant had been seen in the Masons Supply Company store at some time. From this evidence it would not be unreasonable for the jury to infer that defendant had purchased the lime sold by Dana.

It is alleged that counsel for the state was guilty of misconduct during his argument to the jury in making reference to a tape recording which the court had ruled inadmissible. The state had sought to introduce a tape recording of a conversation between Lieutenant Nelder of the San Francisco Police Department and Violet Bostwick. Defense counsel objected to the introduction and playing of the recording on the ground that it was not properly authenticated. The objection was overruled but the court refused to admit the exhibit for the reason which appears in the following colloquy.

"THE COURT: * * * I don't know why the State is offering that exhibit, and I might ask one question, and then I will rule on the matter. Is it your thought that this particular film will displace

statements by this witness that coincide with what she has testified to today?

"MR. HOWLETT: Yes, Your Honor. It will further—

"THE COURT: That is the purpose of it, isn't it?

"MR. HOWLETT: One purpose. The second purpose is for the edification of the jury as to the nature and manner in which she was interrogated by Lieutenant Nelder at the time that she gave her first statement to him.

"THE COURT: You don't want it for impeaching purposes?

"MR. HOWLETT: No, Your Honor.

"THE COURT: Well, I think the rule is pretty well settled. Evidence which is cumulative merely shows that something has been said on other occasions. One, two, or three times is not proper. The credibility of this witness is for the jury under all of the circumstances presented during the course of this trial. I will sustain the objection to the offer.

"MR. HOWLETT: May I stress the second point that because of the cross-examination and the assertion on cross-examination through this witness and creating the innuendo that she was threatened and caused to tell a lie—

"MR. SUNDSTROM: Wait a minute. That is an innuendo of the—

"THE COURT: Just a minute gentlemen. One at a time, now.

"MR. HOWLETT: That this—

"THE COURT: Well, I understand your second point and if the witness was claiming that, herself, I would take a different view of it. I will adhere to my previous ruling and sustain the objection.

"MR. HOWLETT: No further questions."

After both sides had rested and when counsel and the trial judge were in chambers defendant's counsel asked counsel for the state if he intended "to make an issue out of the tape recording to the extent that it has been placed in our hands, or, are you willing to accept the fact that we have not heard it or have not played it?" At first the reply was, "The only issue that I could make out of this, is to—I can't tell the jury defense counsel wouldn't play it. That is improper. The only thing I could do is take what is in the record, and that is that a tape recording was taken of her conversation by Lt. Nelder. I can't refer you—I can't even begin to refer to the fact that we didn't put it in." At the time the latter statement was made counsel for the state was not aware of the fact that defense counsel had stated in the presence of the jury that he had not played the recording. After learning that the jury was so informed, state's counsel said: "Well, if you said it in the record, I will probably refer to it in closing arguments." In his argument to the jury he made the following reference to it:

"* * * Furthermore, we have no reluctance in asking you to believe Bostwick's testimony.

"Bostwick, let me recount that a bit. Bostwick didn't know they were making a recording of her conversation. Neither did Mr. Carskadon [defendant's counsel in the first trial]. Neither did Mr. Smith and neither did Violet Bostwick. So, when she got up and changed her story, what happened? We played the recording, and that was too bad for Harold Keith because the recording was very telltale. Now, this recording, counsel had it and for the purpose of examination. Of course, he knows what it says or could find out from the other lawyers. He could offer it to you to impeach her if there was any difference. Did he offer to play it? You can take that into consideration in determining the

nature of that recording. If Mr. Sundstrom wanted to play that recording, he could do it, but he didn't."

To understand the purpose of this statement it is necessary to recount the events which occurred after defendant's first trial. Violet Bostwick had testified in the first trial. She had also testified in the companion case of *State v. Harold Keith*. Her testimony was damaging to Keith. Later she stated that she had lied in giving this testimony. She signed an affidavit stating that she had been threatened by the police and by the deputy district attorney. Her affidavit recited that San Francisco police officers told her that if she didn't testify as instructed by the Multnomah county district attorney she would be charged with the crime of accessory after the fact. The affidavit further recited that deputy district attorney Howlett told her that if she changed her testimony he would prosecute her for perjury and put her in the penitentiary for life.

■ The statement in the final argument quoted above that "We played the recording, and that was too bad for Harold Keith because the recording was very telltale," referred to the use of the recording in Keith's trial. The vice in making this latter statement was that it would suggest to the jury that if the recording was bad for Keith it was also bad for defendant who was Keith's alleged accomplice. The comment should not have been made. But the question is whether the statement is so prejudicial as to warrant reversal. It should be noted that the jury was denied the opportunity to hear the recording for the reason that it was cumulative evidence. The court's explanation for excluding it as cumulative was made in the presence of the jury. If the jury understood the term "cumulative", it understood that the recording covered the same evidence as that which Violet Bostwick had given on the stand and

the statements in the recording would be no more "telltale" than similar statements made on the stand. This part of the state's argument does not constitute reversible error.

■ The remaining part of the statement set out above is a permissible jury argument. The state's case rested on the credibility of Violet Bostwick. She had testified against defendant in the first trial; she then repudiated that testimony; and finally she repudiated her repudiation. This being known to the jury, her credibility was in grave doubt. If the statement (recorded without her knowledge) was, in essence, the same as her testimony in the present case, it would tend to support her credibility as a witness. The fact that defense counsel did not attempt to show inconsistency between the two statements is ground for the inference that the defense could not find any inconsistency in the two statements. Under these circumstances it seems reasonable to let the state comment on the failure of the defense to attempt impeachment through the use of the recording.

Finally, objection is made to the conduct of the deputy district attorney in interjecting his own personal views with respect to the credibility of the state's witnesses. At one point in his argument to the jury that state's counsel said, "In this particular case this Bostwick girl was telling the truth. We wouldn't have her if she wasn't. It is impossible for her to have been lying. It is impossible for her to have told that story." Defendant contends that the foregoing statements were "an attempt by the deputy district attorney to bolster this key witness by his own unsworn testimony as to her credibility for truth and veracity." Later, counsel for the state said:

"Now, I ask you people to go into that Jury

room and have a little reliance on the police officers, and if I may be so bold again on our office because these witnesses know what they are talking about. They testify to the truth, and Parker is guilty of killing Mr. Holloway. And, we ask you to go in there and if you believe it, if you believe it, find him guilty."

Similar comments were made by the prosecutor to the effect that the state's witnesses were telling the truth, that the state vouched for the credibility of its witnesses, and that the jury should believe the state's witnesses.[7]

■■ It is improper for counsel to interject his personal appraisal of the witnesses' credibility in a way which would suggest to the jury that the appraisal is based upon counsel's own knowledge of facts not introduced into evidence.[8] It is not contended that the statement in the present case was objectionable upon this ground. The rule is sometimes stated more broadly, making improper any comment by counsel upon the

---

[7] The following excerpts from the state's argument to the jury are pointed to by defendant as objectionable:

"Now, three people testified to that including our police officer, and I am willing to stand on all righteousness and say that Officer Ragsdale didn't come up here and repeat that statement if he didn't hear it from Mr. Parker himself, and he made a police report at the time. Police reports are not admissible."

"The State is not permitted to and has no right to permit or to call any witness to that witness stand that it cannot vouch for that witness' credibility to you one hundred per cent."

"* * * to determine who is telling the truth I think, and I ask you, and I have no hesitation in asking you to believe that witness Nora Keith absolutely, implicitly. She is so afraid of hell and fire and damnation that she is afraid to spit for fear she will say the wrong thing. She was an honest, completely honest witness."

[8] See cases collected in Annotation: Propriety, and prejudicial effect of, comments by counsel vouching for credibility of witness, 81 ALR2d 1240 (1962).

credibility of his witnesses.[9] It is unnecessary for us to decide how narrowly or broadly the rule should be stated because we are of the opinion that under either rule the remarks of the prosecution in the present case are not ground for reversal. Moreover, no objection was made at the time the comment was made and no request was made that the jury be instructed to disregard it.[10]

There is no reversible error. The judgment of conviction is affirmed.

GOODWIN, J., specially concurring.

While I agree with the majority that the judgment should be affirmed, I do not concur in the *dictum* to the effect that the testimony of the witness Dana properly could have gone to the jury. The jury was told to disregard the questioned testimony. It is not necessary to a disposition of the pending matter to explore the question of its admissibility *vel non*.

DENECKE, J., joins in this opinion.

PERRY, J., dissenting.

I concur in the conclusion of the majority that venue having been properly laid in Multnomah County in the

---

[9] For example, see Code of Trial Conduct, § 20 (h), American College of Trial Lawyers (1963):

"A lawyer should not assert in argument his personal belief in the integrity of his client or of his witnesses or in the justice of his cause which is unrelated to a fair analysis of the evidence touching these matters."

Cf., Canons of Professional Ethics, American Bar Association Canon 15, which reads in part as follows:

"It is improper for a lawyer to assert in argument his personal belief in his client's innocence or in the justice of his cause."

[10] United States v. Klein, 187 F2d 873, cert. denied, 341 US 952, 71 S Ct 1021, 95 L Ed 1374 (1951); People v. Warren, 175 Cal App2d 233, 346 P2d 64 (1959); State v. Palmer, 206 Minn 185, 288 NW 160 (1939); State v. Braathen, 77 ND 309, 43 NW2d 202 (1950).

first trial of defendant, that court continues to have jurisdiction of the cause on remand until a final judgment is entered. I disagree, however, with the court's dictum to the effect that it is not necessary to determine "whether ORS 131.340 is to be construed broadly as in *People v. Megladdery,* 40 Cal App2d 748, 106 P2d 84 (1940), or narrowly as in *State v. Rider,* 46 Kan 332, 26 P 745 (1891)." Such a statement is misleading, for the rule in *People v. Megladdery,* 40 Cal App2d 748, 106 P2d 84, can have no application in this state by reason of the requirements of the Oregon Constitution.

Article I, Section 11 of the Oregon Constitution provides:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury *in the county in which the offense shall have been committed* * * *." Emphasis mine.

The legislature in enacting ORS 131.340 could not ignore this requirement of the Constitution, therefore the language "acts or effects thereof constituting or requisite to the consummation of the crime" refers to facts which disclose some element of the crime charged. *People v. Thorn et al,* 21 Misc 130, 47 NYS 46; *People v. Lee,* 334 Mich 217, 54 NW2d 305; 22 CJS 479, Criminal Law, § 185 (17).

As is demonstrated by the opinions of their courts, California has no constitutional requirement that the defendant shall have the right to be tried in the county where the crime was committed.

*State v. Megladdery,* supra, cites and relies upon *People v. Richardson,* 138 Cal App 404, 32 P2d 433. In *People v. Richardson* Justice Spence carefully pointed out that the constitution of that state provides, "The right of trial by jury shall be secured to all, and remain

inviolate," (32 P2d 433, 434) and reasoned that since venue was not fixed by the constitution, that power in all cases rested with the legislature. In that particular case a felon had escaped from prison. The legislature had provided "The jurisdiction of a criminal action for escaping from prison is in any county of the state." Section 787, Cal Penal Code; 32 P2d 433, 434. The court held the defendant was not denied any of his rights by not being tried in the county where he escaped.

I must however, dissent from the conclusion of the majority that the defendant was accorded a fair trial. It seems clear to me that the majority are in error when they state "Dana's testimony was relevant and it would not have been error to submit it to the jury."

The majority, in my opinion, in making this statement, fail to understand the issue presented. The question is not that the jury could not infer from the fact that lime was found in the well and that Violet Bostwick had testified the defendant procured lime, that the defendant purchased or obtained lime somewhere, if they first found he committed the crime. The question is whether or not, from the evidence of Dana, the jury could infer that the defendant made this particular purchase at or about the time of deceased's disappearance, and was thus connected with the commission of the crime. In other words, there is no identification of this defendant as the purchaser of this particular lime to establish his guilt by showing a guilty mind. To show his guilt by establishing this act after the crime had been committed would be the only proper purpose of such evidence.

It is the rule of law that before evidence of a particular fact is relevant there must be evidence identifying the party sought to be charged with the doing of

the particular act from which an inference may be drawn. There is not the slightest evidence in this case that this defendant ever purchased four sacks of lime at any time from the Masons Supply Company. All of the evidence merely raises a suspicion that perhaps this particular sale was made to the defendant.

In this posture we have the same situation as that of a witness testifying to finding a defective motor in defendant's shop after plaintiff was injured and there is no evidence that this was the same motor that injured the plaintiff, (*Owen v. Alabama Great Southern R. Co.*, 181 Ala 552, 61 So 924) ; or, the testimony of a witness as to the distance of skidmarks at the scene of an accident, without evidence that the skidmarks were made by defendant's vehicle, (*Schwam v. Reece et al.*, 213 Ark 431, 210 SW2d 903) ; or, the testimony of a witness that he smelled liquor on a bus, for the purpose of showing that defendant driver of the bus had been drinking liquor, when there was no evidence that the odor emanated from the bus driver, (*Conley v. Jennings*, 296 Ky 652, 178 SW2d 185) ; or, testimony that a mark on an automobile looking like a hand impression, without evidence that it appeared to be the impression of one of the hands of the injured pedestrian, (*Hyman v. Bierman*, 130 NJL 170, 31 A2d 762) ; or, where a party suing for the price paid for corporation stock testified that he was advised to purchase the stock by a fortune teller, and there was no showing of any connection between the fortune teller and the defendant, (*Johnson v. Domer*, 76 Wash 677, 136 P 1169).

In each of the above cases the evidence would have been relevant if there had been substantial evidence which identified the fact sought to be established with the actions of the defendant, but since it could not, it

would at most only cast suspicion, and lead to a verdict based upon speculation and conjecture, not fact. This is the established rule in Oregon applicable to criminal cases, and when such evidence is admitted over objection, error is committed which may require a reversal of the judgment. *State v. Fong,* 211 Or 1, 314 P2d 243; *State v. Sing,* 114 Or 267, 229 P 921; *State v. Bailey,* 90 Or 627, 178 P 201.

In this case, for a jury to reach a conclusion as to the guilt of the defendant, they had to rely almost entirely upon the testimony of Violet Bostwick, who had been convicted of the crime of false swearing. She had testified, among other things, that defendant told her he had purchased quicklime at a big store (whether in Portland, or where, is not stated) for the purpose of destroying identification of the body.

When Mr. Dana was called as a witness for the state, he testified as follows:

"Q On the date, did you sell four sacks of processed quickli*n*e? [sic]

"A Yes, I did.

"Q Do you have a record of that sale with you?

"A Yes, I do.

"Q Will you produce it, please?

"* * * State's Exhibit Number—

"THE CLERK: 58 for identification.

"(Whereupon STATE'S EXHIBIT NO. 58 was thereupon marked for identification.)

"MR. HOWLETT: Q Now, what is processed lime?

"A Processed li*n*e [sic] is lime that hasn't been slaked.

"Q What is the difference between processed lime and so-called quicklime?

"A There is no difference.

"Q What do you call it—what name do you have in the trade for it?

"A Hot lime.

"Q And how often do you have occasion to sell hot lime in such small quantities?

"A It is very irregular to just sell four sacks of hot lime to a cash customer such as this was.

"Q Is this a cash sale?

"A Yes.

"Q Will you explain to the jury why it is a rare thing to sell such a small quantity?

"A Well, it has a limited use. It has to be slaked or hydrated, which means combining it with water, before it can be used, and very few people use it for—buy it before it has been slaked. Slaked lime is sold, as such, and you don't have to go through the process of boiling it out with water. That is why it is called 'hot lime.' It boils when you combine it with water.

"Q Now, on October 28th of 1957—let me ask you this, on that date, did you have any other sales of quicklime?

"A No other cash sales for quicklime.

"Q Now, how large a concern is Masons Supply Company, relatively speaking, with other concerns of the same type, of the same type?

"A We are one of the largest in the city.

"Q Now, do you ever recall having made any sales, whatsoever, to the—at your place of business to the defendant in this case, Lee Parker?

"A No, I don't.

"Q Have you ever seen him before?

"A I have seen Mr. Parker before, as I stated originally.

"Q Have you ever seen him in your place of business?

"A Yes, I have."

On cross-examination, the witness testified as follows:

"Q Did you make a sale, cash sale, on the 28th day of October, 1957?

"A Yes.

"Q Is this the sale that you are talking about, this sale of four sacks of processed lime?

"A Yes, it is.

"Q I suppose the obvious question is, did you make that sale to this defendant, Lee Parker?

"A That I can't say. I made the sale, and I don't know who I made it to.

"Q Now, did you—do I understand you correctly that you had seen the defendant, Lee Parker, in your place of business on other occasions?

"A That's right.

"Q Do you know how many other occasions?

"A No, I don't.

"Q Would you say more than two occasions?

"A I wouldn't say that, no.

"Q Would you say less than that?

"A I wouldn't know how many occasions.

"Q Could it have been several times?

"A It could have been.

"Q Would you have recognized Lee Parker upon seeing him?

"A Yes.

"Q Have you ever had occasion to be at the Police Station with regard to identifying an individual that might have purchased this lime?

"A Yes, I have.

"Q Did you have a lineup viewing at that time?

"A That's correct.

"Q  Do you know if the defendant, Lee Parker, was in that lineup?

"A  Yes, he was.

"Q  Did you identify the defendant, Lee Parker, at that time as being the individual that had purchased the lime from you?

"A  No, I did not."

The above testimony discloses only that a sale of lime was made to some person by one of the large concerns in a city of more than 350,000 population, and though the defendant was known to the salesman, there is no identification of the defendant as the purchaser, or even of the defendant's presence in the place of business at or about the date of the sale. Also, the state was apprised of these facts long before the case was called for trial. The state also knew this evidence was irrelevant, for Dana's evidence was not offered in the first trial, and, as will be noticed, the state on direct examination did not attempt to connect the defendant with this purchase. The only purpose, therefore, of its introduction, was to cast suspicion by innuendo upon the defendant, and in the same manner, seek to bolster the testimony of Violet Bostwick.

The question of whether or not an offer of improper evidence should or should not require a reversal is not one that lends itself to strict rules, but depends to a large extent on the importance of the evidence offered, and the good or bad faith of counsel. *Paul v. Drown,* 108 Vt 458, 189 A 144; 109 ALR 1085, and annotation, page 1089.

Certainly it is not every case where some slight prejudice may result that justice requires a reversal, but where substantial prejudice is the result of deliberate action to create that prejudice, the offending

party ought not to be permitted to prosper through his own wrong. This has been the consistent holding of this court where, as in a personal injury case a party has deliberately and intentionally injected insurance coverage into a trial of the cause. *Rosmuny v. Marks,* 118 Or 248, 246 P 723; *Jones v. Sinsheimer,* 107 Or 491, 214 P 375; *Vasquez v. Pettit,* 74 Or 496, 145 P 1066.

It would seem to me that this rule should be more strictly enforced to safeguard the liberty and life of the individual than where only personal possessions are involved. Also, the admonition of the court to disregard this testimony would not cure this error. *Kraft v. Montgomery Ward & Co., Inc.,* 220 Or 230, 234, 315 P2d 559, 348 P2d 239; *Bratt v. Smith et al.,* 180 Or 50, 175 P2d 444; *Guedon v. Rooney,* 160 Or 621, 644, 87 P2d 209.

In *Mooney v. Holohan,* 294 US 103, 79 L Ed 791, the Supreme Court of the United States, in considering a petition for an original writ of habeas corpus wherein the petitioner urged that the state knowingly used perjured testimony, and knowingly suppressed evidence to impeach that testimony, held that such action was a denial of due process. In commenting thereon the court said:

"\* \* \* Reviewing decisions relating to due process, the Attorney General insists that the petitioner's argument is vitiated by the fallacy 'that the acts or omissions of a prosecuting attorney can ever, *in and by themselves,* amount either to due process of law or to a denial of due process of law.' The Attorney General states that if the acts or omissions of a prosecuting attorney 'have the effect of withholding from a defendant the notice which must be accorded him under the due process clause, or if they have the effect of preventing a defendant from presenting such evidence as he possesses in

defense of the accusation against him, then such acts or omissions of the prosecuting attorney may be regarded as *resulting* in a denial of due process of law.' And, 'conversely,' the Attorney General contends that 'it is only where an act or omission operates so as to deprive a defendant of notice or so as to deprive him of an opportunity to present such evidence as he has, that it can be said that due process of law has been denied.'

"Without attempting at this time to deal with the question at length, we deem it sufficient for the present purpose to say that we are unable to approve this narrow view of the requirement of due process. That requirement, in safeguarding the liberty of the citizen against deprivation through the action of the State, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions. Hebert v. Louisiana, 272 U.S. 312, 316, 317. * * *'" (294 US 103, 111).

In *Wilde v. Wyoming*, 362 US 607, 4 L Ed2d 985, the Supreme Court of the United States held that where the prosecutor wilfully suppressed testimony favorable to the defendant, there was a denial of due process.

And again, in *Alcorta v. Texas,* 355 US 28, 2 L Ed2d 9, Alcorta was charged with the murder of his wife. He did not deny the homicide, but relied upon the defense under a Texas statute that the killing was done in "sudden passion arising from adequate cause. * * *" The court said:

"Castilleja, the only eye witness to the killing, testified for the State at petitioner's trial. In response to inquiries by the prosecutor about his relationship with the petitioner's wife, Castilleja said that he had simply driven her home from work a couple of times, and in substance testified that his relationship with her had been nothing more than a casual friendship. He stated that he had given her

a ride on the night she was killed and was parked in front of her home with his car lights out at two o'clock in the morning because of engine trouble. The prosecutor then asked what had transpired between Castilleja and petitioner's wife in the parked car:

" 'Q Did you have a conversation with Herlinda?

" 'A Yes; she opened the door. She was going to get off [sic] and, then she told me to tell my sister to come and pick her up in the morning so she could go to church.

" 'Q To tell your sister, Delfina Cabrera, to come pick her up in the morning so she could go to church?

" 'A Yes.'

"At the conclusion of Castilleja's testimony the following colloquy took place between him and the prosecutor:

" 'Q Natividad [Castilleja], were you in love with Herlinda?

" 'A No.

" 'Q Was she in love with you?

" 'A No.

" 'Q Had you ever talked about love?

" 'A No.

" 'Q Had you ever had any dates with her other than to take her home?

" 'A No. Well, just when I brought her from there.

" 'Q Just when you brought her from work?

" 'A Yes.'

"All this testimony was quite plainly inconsistent with petitioner's claim that he had come upon his wife kissing Castilleja in the parked car.

"Some time after petitioner's conviction had been affirmed Castilleja issued a sworn statement in which he declared that he had given false testi-

mony at the trial. Relying on this statement petitioner asked the trial court to issue a writ of habeas corpus. He contended that he had been denied a fair trial in violation of State and Federal Constitutions because Castilleja had testified falsely, with the knowledge of the prosecutor, that his relationship with petitioner's wife had been only 'that of a friend and neighbor, and that he had had no "dates," nor other relations with her, when in truth and in fact the witness had been her lover and paramour, and had had sexual intercourse with her on many occasions . . . .' Petitioner further alleged that he had no knowledge of this illicit intercourse at the time of his trial.

"A hearing was held on the petition for habeas corpus. Castilleja was called as a witness. He confessed having sexual intercourse with petitioner's wife on five or six occasions within a relatively brief period before her death. He testified that he had informed the prosecutor of this before trial and the prosecutor had told him he should not volunteer any information about such intercourse but if specifically asked about it to answer truthfully. The prosecutor took the stand and admitted that these statements were true. He conceded that he had not told petitioner about Castilleja's illicit intercourse with his wife. He also admitted that he had not included this information in a written statement taken from Castilleja prior to the trial but instead had noted it in a separate record. At the conclusion of the hearing the trial judge denied the petition for habeas corpus. Petitioner then applied to the Texas Court of Criminal Appeals for a writ of habeas corpus but that court, acting on the record made at the hearing before the trial court, also refused to issue the writ. We granted certiorari, 353 U.S. 972. Texas concedes that petitioner has exhausted all remedies available to him under state law.

"Under the general principles laid down by this Court in Mooney v. Holohan, 294 U.S. 103, and Pyle

> v. Kansas, 317 U.S. 213, petitioner was not accorded
> due process of law. It cannot seriously be disputed
> that Castilleja's testimony, taken as a whole, gave
> the jury the false impression that his relationship
> with petitioner's wife was nothing more than that
> of casual friendship. * * *"

In the present case, neither in oral argument nor in the briefs does the state contend that it did not know, but honestly believed, that evidence would be offered to connect the sale of the lime to the defendant. I am able to discover no difference in principle between deliberately using incompetent damaging evidence in the hope of obtaining a conviction, and deliberately withholding evidence favorable to a defendant. Each type of action denies a defendant a fair trial.

While it is the duty of all prosecuting attorneys to prosecute those accused of violating the laws of this state with vigor, their duties do not transcend the requirement of the law that the guilt of a party shall be established after a fair and impartial trial conducted according to the rules prescribed for that purpose.

> "The primary duty of a member of the State
> Bar engaged in public prosecution is not to convict
> but to see that justice is done." Rule 28, Rules of
> Professional Conduct, Oregon State Bar.

Honesty and fairness will not permit the courts to sanction improper conduct by sustaining verdicts obtained in deliberate violation of rules of law promulgated and established for the purpose of providing that convictions shall be had upon competent evidence and not "innuendo and pettifoggery." *State v. Rollo,* 221 Or 428, 438, 351 P2d 422.

There is also in this case such conduct of the prose-

cution that this judgment should not be permitted to stand.

The state called Violet Bostwick to testify that in the course of a trip with the defendant from Portland to San Francisco the defendant told her the rope he was carrying in the car had been used by him to lower one Harold Keith into the well to retrieve the body of Holloway for better concealment. She also testified that defendant told her he had purchased two fifths of liquor in Portland and that the deceased had gotten into a car because deceased would go anyplace for liquor, and further, he had purchased quicklime to destroy identification of the body. This witness had also testified to these facts in the prior trial, and subsequent thereto made affidavit to the effect that her testimony given in the trial was false. Later this witness was indicted for false swearing. This indictment was based on the affidavit that she had sworn falsely in the first trial of the defendant. She pleaded guilty to this charge. These facts were all brought to the attention of the jury in this case. The question of the veracity of this witness was clearly a pivotal issue in this case. The Deputy District Attorney, in his closing arguments, stated:

"So, we ask you to give to the law enforcement officials, even if I may be so bold as to ask to our office, and have some, give some credit to our sensibilities in developing these cases. In this particular case this Bostwick girl was telling the truth. We wouldn't have her if she wasn't. It is impossible for her to have told that story."

And moments later continued:

"Now, I ask you people to go into that jury room and have a little reliance on the police officers, and if I may be so bold again on our office

because these witnesses know what they are talking about. They testify to the truth, and Parker is guilty of killing Mr. Holloway. * * *"

Again, the state prosecutor said:

"The state is not permitted and has no right to permit or to call any witness to that witness stand that it cannot vouch for that witnesses' credibility to you one hundred per cent."

Also, after the trial court had ruled that a certain tape recording taken by a San Francisco officer of his conversation with Violet Bostwick was inadmissible in evidence, the Deputy District Attorney, after stating to the court and defense counsel in chambers:

"I can't tell the jury defense counsel wouldn't play it. That is improper. The only thing I could do is take what is in the record, and that is that a tape recording was taken of her conversation by Lt. Nelder. I can't refer you—I can't even begin to refer to the fact that we didn't put it in[,]"

in argument, for the purpose of bolstering the testimony of Violet Bostwick, made the following statement:

"* * * We played the recording, and that was too bad for Harold Keith because the recording was very telltale. Now, this recording, counsel had it and for the purpose of examination. Of course, he knows what it says or could find out from the other lawyers. He could offer it to you to impeach her if there was any difference. Did he offer to play it? You can take that into consideration in determining the nature of that recording. If Mr. Sundstrom wanted to play that recording, he could do it, but he didn't."

The defendant contends that the above statements of the prosecuting attorney, though not objected to,

were so erroneous and prejudicial that the defendant was denied a fair trial.

Rule 15 of the Canons of Professional Ethics of the American Bar Association states, "It is improper for a lawyer to assert in argument his personal belief in his client's innocence or in the justice of his cause." It is also highly improper to attempt to bolster the testimony of a witness by personally vouching for the witness' veracity. *East v. Commonwealth,* 249 Ky 46, 60 SW2d 137; *Fitzgerald v. State,* 91 Okla Cr 437, 219 P2d 1024; *Hall v. State,* 115 Tex Cr 548, 27 SW2d 187; *People v. Nichols,* 159 Mich 355, 124 NW 25.

With reference to the statement of the prosecuting attorney last set out, it is quite clear that the prosecuting attorney went beyond the evidence in the record. The record in this case discloses that a tape recording was made of an interview between San Francisco police officers and Violet Bostwick—this unknown to Violet Bostwick. The recording itself, though offered by the state, was not received in evidence, therefore its contents were not for the consideration of the jury. In spite of this, however, the tenor of the prosecutor's argument is that he has heard the recording; that it was the fault of defendant that they were not permitted to hear it; and if they were permitted to hear this recording, they would know that Bostwick's testimony concerning the defendant was true.

Early this court laid down the rule that it was reversible error for counsel to state facts pertinent to the issues not in evidence. *Tenny v. Mulvaney,* 8 Or 513.

In *Huber v. Miller,* 41 Or 103, 68 P 400, 54 Cent L Jour 429, Mr. Justice WOLVERTON stated the rule thusly:

"It is the privilege of the counsel in argument

to comment upon the evidence and facts proven, and to draw all legitimate inferences therefrom. In this the law accords to him a large degree of freedom, and the means thus accorded is justly regarded as most efficient in arriving at the truth. The latitude or range of argument, however, cannot be permitted to extend beyond the facts in evidence, and it is a just and ample cause for reversal where counsel, against objections, are notwithstanding allowed to state facts pertinent to the issues not in evidence, or to assume in argument that such facts are in the case. The jurors are triers of fact upon the evidence adduced, which is scrutinized in its admission by the court, and they must exclude extraneous matters from consideration in arriving at their verdict; hence it is inconsistent and incompatible with the dictates of common justice for counsel to attempt to influence them by statements of facts outside the range of evidence, * * *." (41 Or at 115).

As admitted by the defendant, no objections were made to these statements of the prosecuting attorney. It is a rule of law that only error legally excepted to will be reviewed and considered by this court on appeal. This court does, however, reserve the right in proper cases to take notice of errors of law apparent on the face of the record, though no objection was made in the trial court. *State of Oregon v. Nodine,* 198 Or 679, 259 P2d 1056.

A proper case exists whenever it appears that the errors committed have prevented a defendant from having a fair trial as contemplated by law. *State v. Bouse,* 199 Or 676, 264 P2d 800; *State of Oregon v. Moore,* 194 Or 232, 241 P2d 455; *State v. Pace,* 187 Or 498, 212 P2d 755.

The remarks of the prosecuting attorney were clearly erroneous and prejudicial, and this together

with the deliberate introduction of irrelevant evidence, leaves no doubt in my mind that the defendant was not accorded a fair trial. I therefore dissent.

Mr. Justice ROSSMAN joins in this dissent.

SLOAN, J., specially concurring.

The real problem to be resolved in this case is to decide if defendant was prejudiced by the conduct of the prosecutor. The trial judge who observed the conduct did not think so when he ruled on a motion for new trial. The ruling of the trial judge provides additional persuasion to me to affirm the judgment.